THE HOFFMAN STEAM COAL COMPANY, OF AL-
LEGANY COUNTY, *vs.* THE CUMBERLAND COAL
& IRON COMPANY.

A *director* in a corporation at the time a sale of part of its property was
contemplated and made, and who actively participated in all the meas-
ures tending to its completion, and had full knowledge of all the cir-
cumstances attending its progress, is *not competent* to become a *pur-
chaser* of such property, and the sale to him cannot be upheld if resisted
by the corporation.

A party joining in a purchase from a corporation, with knowledge of the
fact that his co-purchaser was a director in the corporation, is affected
with whatever of legal disability belonged to the director by reason of
that relation.

A director having purchased lands from a corporation, united with others
in forming a new corporation, he subscribing for almost all of the stock
therein, and becoming one of its officers and directors, and on the next
day, in pursuance of one entire plan, conveyed the same lands to the
new company in payment of his subscription for such stock. HELD:

That the new company is affected with notice of the circumstances impair-
ing the title of the party so conveying the lands to it, and cannot claim to
be a *bona fide* purchaser without notice.

Trustees cannot purchase at their own sales, either directly or indirectly,
and if they do, such purchases will be set aside on the proper and rea-
sonable application of the parties interested.

The same doctrine applies to purchases by persons acting in any fiduciary
capacity, which imposes on them the obligation of obtaining the best
terms for the vendor, or which has enabled them to acquire a knowledge
of the property; a director in a corporation holds such a relation to its
stockholders.

To render the ratification of such a sale effective and conclusive, the
principal must, at the time of the ratification, be fully aware of every
material fact, and his act of ratification be an independent substantive
act, founded on complete information, and he must not only be aware of
the facts, *but apprized of the law as to how these facts would be dealt with
if brought before a court of equity.*

Where a purchaser, with notice from a trustee, conveys, for a valuable
consideration, to another person who has no notice of the trust, the es-
tate will not be affected with the trust in the hands of the second pur-
chaser.

APPEAL from the equity side of the Circuit Court for Al-
legany county.

This appeal is from two orders of the court below, refusing

to dissolve and continuing till final hearing, an injunction granted upon a bill filed, on the 6th of December 1858, by the appellee against the appellant, and Allen M. Sherman and Wm. B. Dean, for the purpose of vacating a deed made by the complainant to Sherman and Dean, for certain coal lands in Allegany county, as well as to set aside a contract for transportation, which was executed at the same time, and in fact accompanied the de·d.

By this deed, dated the 22nd of April 1856, the Cumberland Coal and Iron Company conveyed 1215 acres, part of its coal lands, to Sherman and Dean, five undivided eighths thereof to the former, and three undivided eighths thereof to the latter, in consideration of the sum of $28,000, in hand paid to the company by the grantees, and the further sum of $112,000 to be paid by the grantees, by paying and satisfying 112 bonds of the company for $1000 each, being part and parcel of 467 bonds, for the same amount each, issued by the company and payable on the 1st of January 1864, with six per cent. interest, payable semi-annually, on the 1st of July and January in each year, the grantees assuming and undertaking to pay the principal and interest of said 112 bonds.

By the transportation contract, between the same parties and of the same date, and recited to have formed "a part of the inducement and consideration of said purchase," the company agrees and covenants with Sherman and Dean, and their heirs, lessees and assigns, to provide and maintain in good order, for the full term of twenty years from the 1st of May 1856, a good and sufficient railroad from the lands granted by the deed, to Cumberland, and to provide at all times during that period suitable and sufficient cars and engines, and to receive and take all the coals and other freight which may be min·d and produced upon and from said granted lands, and to carry at certain specified rates and deliver the same at the city of Cumberland, in and upon the cars of the Baltimore and Ohio Railroad, or into and upon the boats on the Chesapeake and Ohio Canal, and for a.

refusal on the part of the company to comply with their part of this contract a heavy penalty is provided.

On the 19th of August 1858, Sherman and four other parties formed themselves, under the provisions of the Act of 1852, ch. 322, entitled: "An Act to authorize the formation of corporations for mining purposes," into a company under the corporate name of "The Hoffman Steam Coal Company of Allegany county," for the purpose of carrying on the business of mining coal in Allegany county, with a capital stock of $500,000, to be divided into 5000 shares of the par value of $100 per share, and on the next day (20th of August 1858) Sherman and Dean conveyed, by deed, to the company the land which had been previously conveyed to them by the Cumberland Coal and Iron Company. This deed recites that Sherman and Dean became subscribers for and took, 4990 shares of the capital stock of the Hoffman Steam Coal Company, on the express agreement and understanding, that the price of such shares should be paid for by the conveyance of these lands, and all rights and easements thereto belonging, and they are conveyed subject to the lien thereon reserved by the Cumberland Coal and Iron Company for the payment of the interest and principal of the 112 bonds of that company, referred to in the deed to Sherman and Dean; and the Hoffman Steam Coal Company accepted this conveyance with the express understanding and agreement that it should pay, or provide in the hands of Sherman and Dean the means to pay, the interest and principal of these bonds as they became due, in exoneration of all liability on the part of Sherman and Dean to the Cumberland Coal and Iron Company.

The gravamen of the bill is, that Sherman, one of the grantees in the deed from the complainant to him and Dean, was one of the directors of the complainant, and it is insisted, therefore, that by reason of his being a director he was under a legal disability to become a purchaser from the complainant; and that Sherman was either in fact the sole purchaser, and the use of Dean's name merely colorable, or else that Sherman was the agent of his co-grantee in making the

purchase. The bill also charges fraud in fact, in obtaining said deed and transportation contract. It also charges that the Hoffman Steam Coal Company was formed and is conducted, controlled and directed by Sherman; that he and Dean became subscribers for 4990 out of the 5000 shares of its capital stock, and the other ten shares were nominally taken by other parties, to enable them to participate in the formation of the company and become directors; that Sherman is an officer as well as director of the company, and has and exercises entire practical control over it, and that the change or conversion of his ownership in the said lands into an interest in the stock in said company, by the deed of the 19th of August 1858, and the said subscription for stock was a fraudulent device, for the purpose, and with the design, of evading the jurisdiction and process of this court; and that said company, before the execution and delivery of said deed, and said Dean before he entered into the purchase of said lands, had full notice of the frauds in said sale, and in the procurement, origin, formation, execution and delivery, of the deed and transportation contract from the complainant to Sherman and Dean. It also charges that the lands so sold are of great and peculiar value, and possess important advantages for economy of mining and transportation; that they were sold at a grossly inadequate price, and that Sherman and Dean have already mined and taken therefrom large quantities of coal, and are continually removing coals from said lands and converting the same to their own benefit.

The prayer of the bill is, that all the defendants may be enjoined from conveying or encumbering these lands, and from mining and taking away coal therefrom, or assigning the said transportation contract, or instituting any action for any alleged breach thereof; and that Sherman and Dean may be enjoined from transferring or encumbering any shares of stock in the Hoffman Steam Coal Company, or from parting with the possession and control of the said deed and contract of transportation; and that the said contract of transportation and the deed of the 22nd of April 1586, and the conveyance of said lands to the Hoffman Steam Coal Company may be

declared void, and a re-conveyance thereof be decreed to the complainant, and that Sherman and Dean should convey to the complainant all the shares of stock in the Hoffman Steam Coal Company which they had received, and that the defendants may be decreed to account for the coal removed from the lands, and the proceeds thereof, which they have received, and for general relief.

The injunction was granted as prayed, and the defendants filed separate answers. The answer of Sherman denies positively the various allegations of fraud contained in the bill, denies that Dean was a mere nominal party, or that he acted for Dean in making the purchase, and denies that the Hoffman Steam Coal company and himself, or himself and Dean, are the same, or that he has any greater interest in the stock of, or power over, the said company, than any other of its directors or stockholders. He sets out in his answer all the facts attending the sale, and all the proceedings and resolutions of the stockholders and directors of the complainant, relating thereto.

The answer of Dean confirms that of Sherman, and in addition sets up that he was a *bona fide* purchaser for a valuable consideration, without notice of the complainant's alleged equity, and without even notice of the fact that Sherman was a director of the complainant.

The answer of the Hoffman Steam Coal Company also denies all fraud, and pleads that it is a *bona fide* purchaser for a valuable consideration without notice of the complainant's alleged equity, and also avers, that subsequently to the execution of the deed of the 22nd of April 1856, from the complainant to Sherman and Dean, it was represented that some informality existed in the manner of the acknowledgment of the same, and thereupon two other deeds, one of the 24th of September 1857, and the other of the 1st of October 1857, from the complainant to Sherman and Dean, for the same lands, were executed and recorded, prior to the execution of the deed of the 20th August 1858, from Sherman and Dean to this respondent, which refers to the deed of the 1st of October 1857, as the deed under which the said vendors'

Hoffman Steam Coal Co. *vs.* Cumberland Coal & Iron Co.

had title to and held said lands, and that neither of these deeds, of the 27th of September and the 1st of October 1857, is, in any manner, assailed or impugned by the bill, and are clear and unequivocal confirmations, by the complainant, of the right and title of Sherman and Dean in and to the said lands.    This answer also relies upon other acts of the complainant as confirmatory of the transaction, even if it were originally avoidable.

After the answers were filed, all the defendants moved to dissolve the injunction.    Testimony was then taken by the parties, under the Act of 1835.    The bill, answers, exhibits and testimony, are too voluminous to admit of a statement of them at length.    The facts, it is thought, are stated sufficiently for an understanding of the opinions delivered and the points decided, in the opinions themselves.

Prior to the hearing of the motion to dissolve, the complainant asked leave to amend its bill so as to set forth and include therein all like statements, allegations and prayers in respect to the two deeds, of the 27th of September and the 1st of October 1857, as are set forth and included in respect to the deed of the 22nd of April 1856, the said two deeds purporting to be conveyances for the same lands, and merely confirmatory of the latter.    The cause was then heard on the motion to dissolve, and the court, on the 25th of May 1859, refused this motion, and passed an order allowing the complainant to amend its bill as prayed, without prejudice to the injunction already granted.    The following is the opinion of the court below (PERRY, J.) delivered upon passing this order:

"The opinion I entertain in regard to the law by which this case must be determined, dispenses with a lengthy statement of facts.

"It appears that on the 21st of February 1855, Allen M. Sherman, one of the defendants, was elected a director of the Cumberland Coal and Iron Company, and was in that board, acting as such, until the 29th of May 1858; that during that period, he was, by said company, appointed on a committee

to report upon the propriety of a sale of part of its real estate; that on the 22d of April 1856, a deed was made by that company, conveying to him and one Dean, also a defendant, 1215 acres of land; for that, and what is called the transportation contract, they were to give $140,000; that they, Sherman and Dean, on the 20th of August 1858, conveyed this land to The Hoffman Steam Coal Company, a corporation organized under the Act of 1852, ch. 322, such organization having taken place since the execution of the deed of the 22d of April 1856, from the complainant to them; that Dean acquired his title under the circumstances hereinafter detailed. The bill was filed on the 6th of December 1858, and prays for an account and an injunction to prohibit the defendants from excavating coal, and for a decree to vacate the deed.

"The questions to be determined are, whether Sherman could, while acting as a director, purchase the land conveyed by the deed of the 22d of April 1856, and now in dispute? and whether there exists such a state of facts as to make an equitable title in The Hoffman Steam Coal Company, by ratification, acquiescence, or a purchase by that company, without notice, and by which this court can pass a decree affecting the rights or title of Dean to the lands in controversy?

"It has been established from the earliest period to be the general rule of law, 'that a trustee cannot be a purchaser and seller, so as to divest his *cestui que trust* of all title in the property sold.'—'A trustee, it is true, may buy from the *cestui que trust*, provided there is a distinct and clear contract, ascertained to be such after a jealous and scrupulous examination of all the circumstances, that the *cestui que trust* intended the trustee should buy, and there is no fraud, no concealment, no advantage taken by the trustee, of information acquired by him in the character of trustee.'—'But when a purchase is made, by a trustee, of trust property, or any part of it, *for himself*, such a transaction is looked upon with greater odium and suspicion than where the dealing is between the trustee and his *cestui que trust*.' It has also been determined, 'that without any consideration of fraud, or looking beyond the relation of the parties, such a contract was void,

as interdicted by the policy of the law.' And though the authorities seem scarcely to warrant that assertion in its extreme sense, yet it is indisputably established that such a transaction will not be allowed to prevail under any circumstances during the continuance of the fiduciary character, unless it be made with the full concurrence and consent of the persons beneficially entitled to the property, who, of course, must be competent to consent, and even then it will be regarded with great suspicion. In the absence of such corroborative circumstances, a purchase of this kind, however fair and honest in itself, is voidable at the option of the *cestui que trust;* nor is it necessary to show that the trustee has made any profit, or obtained any advantage, by his purchase; although it will be supported against the purchaser, if found to be beneficial to the trust estate. This doctrine applies not only to trustees, strictly so called, but also to persons standing in a similar situation, as agents for buying or selling property. 'He who undertakes to act for another, in any matter, cannot, in the same matter, act for himself.' *Burrill on Assignments,* (2nd Ed.,) 503. Where any person, acting as agent for others, sells a trust estate, and becomes himself interested, either directly or indirectly, in the purchase, the *cestui que trust* is entitled, as of course, in his election, to acquiesce in the sale or not. It is thus seen that he cannot act as agent, and become himself the buyer and seller at the same time. The policy of the rule is to shut the door against temptation, which, in cases in which such relation exists, is deemed to be of itself sufficient to create the disqualification. 4 *Kent,* (7th Ed.,) 438. 1 *Story's Eq.,* sec. 322. *Story on Agency,* sec. 211. *Michoud vs. Girod, et al.,* 4 *How.,* 503, 554, 558. Such doctrine is undoubtedly maintained in Maryland in the late case of *Keighler, et al., vs. Savage Manuf. Co.,* 12 *Md. Rep.,* 416. The Chief Justice says: 'Its paramount and its vital principle is good faith; without it, the relation of principal and agent cannot exist; and so sedulously is this principle guarded, that all departures from it are esteemed frauds upon the confidence bestowed. And that if an agent buy without the consent and knowledge

of a principal, or if with the consent, the principal not being fully and thoroughly advised of every fact and circumstance in the possession of the agent, such sales are invalid.' From these authorities it will be seen to be the law, that one who is connected with another, by being employed as agent to make sale, is incapable of purchasing at such sale by himself or by his control, as it would invest him at the same moment, with inconsistent, contradictory and conflicting characters; that a title to property, purchased under such circumstances, can only be acquired by the ratification of the sale, acquiesced in by those who are interested in its disposition, and then, after a full exposition of all the facts known to the purchaser; that the law does not impose upon the *cestui que trust* the necessity of showing the existence of actual fraud, the inquiry being not whether such was or was not the case; that the purchase is voidable at the instance of the *cestui que trust*, on the ground of policy, to remove all temptation to abuse, and of danger of imposition, and which could not be easily exposed.

"Whether Sherman is to be regarded as trustee, in a technical sense, it is not important to determine. It is enough to know that he was acting for others; that he was clothed with powers which imposed upon him the duty to sell for the benefit of the stockholders of the company. He was not only a director, but on the executive committee, to inquire into the policy or propriety of the sale; was possessed of all information as to the value of the land, all circumstances which suggested the expediency of the sale, and after such was determined upon, was retained to make the sale; was standing in the relation of the greatest confidence; an agent of the complainant, and to act for the benefit of its stockholders. Independent of the special appointment of the board of directors, his position, as such, in some sense, made him a trustee for the stockholders. For them, they were to administer the affairs of the company. The stockholders were the persons to be benefited or injured. A sale of the land for less than its real worth, impaired the value of the stock in the same proportion. The directors could not, for

the reasons assigned, sell to themselves. It is equally certain that one of their number, selected to sell, for the purpose of liquidating the indebtedness of the company, could not make such contract to buy. *Burrill on Assignments*, (*2nd Ed.*,) 504, 505. *Whitcote vs. Lawrence*, 3 *Ves.*, 740. *Morse vs. Royal*, 12 *Ves.*, 374.

"It has been urged, with much ability, that no adjudicated case can be produced to decide the contract of sale abso-lutely void; that it is valid to communicate a legal title to Sherman and Dean; and for that reason the complainant has to show affirmatively such circumstances as will justify the equitable interposition of this court in its favor; that the rules of equity, as applicable to Sherman, in consequence of his relations to the complainant, cannot operate against Dean, as he does not occupy that position. For the reasons already given, it would not be necessary for me to know more from the testimony than that the defendant was a director of the Cumberland Coal and Iron Company, to authorize this court to set aside the deed at the instance of that company. But as Dean is not in that predicament, his rights cannot be im-paired from that circumstance. Before determining the case as to him—the probable interest or motives leading him to contract—I will look to some facts which have had influence upon my mind. There is nothing in the case to show that the transportation contract was ever made known to any person to buy—indeed, that any one was cognizant of its existence, except the parties connected with it. The contract or deed does not, in fact, liquidate or release the liability of the Cum-berland Coal and Iron Company to pay either the principal or interest of the 112 bonds, part of the 467 bonds for $1000 each, at the rate of six per cent. per annum, payable semi-annually on the first day of July and January 1864. It ap-pears by the deed to Sherman and Dean, that they assumed and undertook to pay the principal and interest on these bonds; while, in truth, the responsibility of the company still continues. Afterwards, the Hoffman Steam Coal Com-pany made a similar contract, by which that company was bound to pay the principal and interest of the bonds referred to

It will be seen also, that the complainant, for the $112,000, had no other security than the undertaking of Sherman and Dean and the Hoffman Company, as mentioned in those deeds; that if the parties paid the interest until the year 1864, the complainant could not complain of a violation of the contract; that in the meantime, by the transportation ⸳contract, the complainant was bound to furnish cars, and transport all coal, for Sherman and Dean, without restriction as to quantity; and in the event of a failure or refusal of the complainant to comply with the agreement, as originally made, heavy sums, as liquidated damages, were to be paid. By the testimony, Dean appears to be a young man, about twenty-three or twenty-four years of age, without property or other sources of support, engaged in book-keeping in a mercantile house, with a salary merely sufficient to pay his ordinary expenses; and there is no evidence of his ever having seen the property purchased. Can it be esteemed as a contract made in good faith by him, with the expectation of paying his part of the purchase money ? He had nothing. He did not know its value. Did he invest large sums, and assume heavy engagements, with a knowledge that he could and would comply ? Can it be for a moment supposed that his money was used for that purpose? I have no doubt it would take much more to comply with his part of the agreement, than he seemed to be possessed of. His total want of means; total absence of ability to pay, and, in the language of Judge Davies, of New York, 'the readiness with which he entered into liabilities to such an amount, gives countenance to the allegation, that he was a man of little or no pecuniary responsibility.' I cannot see the wisdom of the contract on the part of the company; how they could have been induced to make a deed to this irresponsible grantee; this can only be reconciled with the presumption that it was not for or with him, but that he was sent as the instrument to secure the title to others. He at least could not have been willing to invest the amount he was to pay. If he were the owner of his part of the first payment, is it reasonable to suppose he could have invested it in so careless a manner as is contended was done by him in

this case? Would he have remained a clerk, at a salary not more than sufficient for his support, instead of using it in trade, or some other business, with hopes of a profit more certain than the uncertain trade in coal? Judging him by those rules which govern human conduct, he would have, if his purchase were real and *bona fide* on his part, thoroughly examined the condition, value, location, and every circumstance reflecting upon the land and its title, before he would have embarked his entire fortune in such an enterprise. But the testimony proves nothing of this kind to have been done. Did he not know that Sherman, his companion in the purchase, was a director in the Cumberland Coal and Iron Company? And in the absence of all other circumstances with which Dean is environed, it may well be questioned whether the deed would not be void on that account. He must have known the circumstances by which, as I have already stated, the law makes the purchase by Sherman a constructive fraud. Does not the participation of Dean in the purchase with this knowledge, taint the transaction with such fraud? It was, as testified to by Mehaffy, one entire contract, and if void as to one it may be doubted whether it is not void as to both. As he aided in the consummation of a contract which, from the wisest policy, the law has pronounced constructively fraudulent, and united with one to do that which would bring about a conflict between his self-interest and integrity, should he not be subject to those principles of law by which such transactions, as to his co-grantee, can be invalidated? The fact that Sherman tendered his resignation to the board of directors, and that such was refused, has been referred to for the purpose of showing that he had placed himself in a condition to justify his purchase. His being a director, and sustaining that character, and not, as such, being competent to purchase, such effort and refusal do not change that relation. It must be actually or virtually dissolved. He might have retired from the office and qualified himself for becoming a purchaser by divesting himself of that character, or if he retain the situation the parties must be put so much at arms length

that they agree to stand in the adverse situations of vendor and purchaser.

"Conceding the deed to be voidable, it is urged that the conduct of the complainant has been such as to operate a confirmation of the sale in a court of equity. The doctrine upon that subject is, that those acts which will be esteemed as a confirmation must be of a deliberate character, by the party beneficially interested in the property, and where he was in possession of the nature of the contract, and honestly made acquainted with all the material circumstances of the case. There must be no *suppressio veri,* or *suggestio falsi;* the law requiring an exposition of the nature and terms of the contract, and that he was acquainted with his rights; that is, he must be aware 'that the transaction is of such a character that he could impeach it in a court of equity.' *Lewin on Trusts,* 390. *Bell vs. Webb & Mong,* 2 *Gill,* 163. *Hill on Trustees,* 255, 256. I have seen no fact or circumstance in this case which authorizes me to determine, that the stockholders—those whose interests and rights are materially affected, indeed, the only persons injured—have been made acquainted with the nature and extent of the contract and sale in this cause. And the rule being, 'that they must be aware that the transaction is of such a character that they could impeach it in a court of equity,' I repeat, I cannot see in the case the least evidence to establish such a knowledge. Nor do I esteem the lapse of time as sufficient to bar the complainant. In all the cases to which I have been referred, much greater time has been required than exists in this. In England, in many of the early cases, the same period of time was required which governs the statutes of limitations. The modern doctrine is, not to regard the time of limitation as controlling the courts, but to leave each case to rest much on the facts. 'As it must be difficult to lay down, as a general proposition, what length of acquiescence will be a bar, this must necessarily be a matter of equitable discretion, depending on the nature of the transaction and the circumstances of the parties in each individual case.' *Hill on Trustees,* 258. *Smith vs. Clay,* 3 *Brown's Ch. Rep.,* 639. ' *Stackhouse vs.*

*Barnston*, 10 *Ves.*, 466. *Bell vs. Webb & Mong*, 2 *Gill*, 168. As before stated, in none of the cases to which I have been referred, have the courts gone so far as to decide what time must elapse to be sufficient. In one of the cases, (*Mason vs. Martin & Kemp*, 4 *Md. Rep.*, 124, 125,) the court has intimated, that if, with a full knowledge of the transaction, the *cestui que trust* lies by for an unreasonable time, it will be considered as an acquiescence in the sale. So in the case of *Williams vs. Marshall*, 4 *G. & J.*, 376, fourteen years was sufficient time to protect the executor, who was a purchaser at his own sale, against a stranger who sought to set it aside. I do not hesitate to regard the law as requiring from all directors of corporations, a careful and constant supervision over the rights, interest and property of the stockholders. The position or office they accept, imposes upon them a sacred obligation; and a departure from this duty will, in my opinion, be fraught with dangerous consequences to innocent stockholders and persons who have bestowed upon them that confidence which should exist in those they may select to protect their interest. For a court of equity to be content with slight circumstances of confirmation, to determine doubtful facts to be enough to operate as a bar to all equitable relief, would be in conflict with the policy of the law, and an invitation to persons, who are selected to protect the property of corporations, to attempt a disposition of it to their own aggrandizement. They should be removed from such temptation, and any act which does not clearly point to the benefit of those for whom they were appointed, should be regarded with extreme jealousy. If a deed made to one of the directors is not sufficient to communicate a title which cannot be disturbed by a stockholder, surely acts of confirmation by the same body, and while the grantee remains a director, can have no greater validity. The deed is a solemn contract. The corporate acts claimed to be sufficient for confirmation, being of a less certain and solemn character, should not be esteemed of greater efficacy. Nothing has occurred between the period of Sherman's resignation May 29th, 1858,) and the filing of the bill, (December 6th,

1858,) which can be esteemed evidence of such confirmation.

"The question, which has been ably argued, and which has been to me one of the greatest difficulty, is, whether the Hoffman Steam Coal Company is a purchaser without notice ?    The law in Maryland, as announced by the late *Chancellor Johnson*, is, 'that notice given to a director of an incorporated institution privately, or which he acquires from rumor, or through channels open alike to all, and which he does not communicate to his associates at the board, will not bind the institution.    But if the notice is given to him officially, for the purpose of being communicated to the board, although such notice should not be communicated, the institution is bound by it.'    *United States Ins. Co. vs. Shriver*, *et al.*, 3 *Md. Ch. Dec.*, 383.    The Court of Appeals of this State has also determined, 'that knowledge of the president of a corporation is not knowledge of the corporation.'    That it is true, as a general rule, 'that the principal is affected with the knowledge, and bound by the acts of the agent.' But this principle can have no application to a case in which the one party does not act as the agent, but avowedly for himself.    'To hold the company responsible for all the acts of its officers, when they act confessedly in behalf of their interest, and in an adversary character, would be to sanction the grossest fraud; and that the general proposition was, 'that an agent, within the scope of his authority, may bind his principal; but not that an officer of a corporation may bind the latter in all cases whatever, especially not in a case in which he professes to represent none other than himself, and to deal with the company as though he had no official relation to it.    And unless it was shown that the knowledge of the officer was communicated to the company, it was not sufficient to affect its rights.'    *Winchester & Lemmon vs. Balt. & Susq. Rail Road Co.*, 4 *Md. Rep.*, 239, 240.    Such being the law, as thus enunciated, it is insisted that there is no fact or circumstance to show, that any officer of that company has ever been officially advised in regard to the equities of the complainant; that nothing exists by which the com-

pany could have been induced to have made inquiry. In other words, that there is no such official communication with, or notice to this corporation, as required by the law of this State, which deprives it of the advantages secured to them as *bona fide* purchasers. As already stated, I esteem the directors as those who have imposed upon them the duty of protecting the property of the corporation, and so administering its affairs as to advance the interests of the stockholders; and that all that may be done for the personal aggrandizement of these officers, and not for those they represent, will be regarded with the utmost distrust. The directors are the persons whom the charter has empowered to act for those who are interested in its capital or property. It is the general rule of law, as announced in the cases of the *United States Ins. Co. vs. Shriver, et al.,* and *Winchester & Lemmon vs. Balt. & Susq. Rail Road Co.,* that there must be official notice given to bind the institution. This could not be controverted if an effort was made to impute notice to an existing corporation, and when innocent parties had become concerned, and employed their means in the consummation of the purchase. The design of this rule is to protect persons in that condition; not those to whom the law imputes fraud in fact or by construction. Sherman and Dean were the owners of the land at the time of the organization of the corporation. Will not the law fix upon them a knowledge of the legal rights of the complainant at the time of the subscription for the stock? They being entitled to the certificates, were as effectually, indeed more conclusively bound, than by a formal notice to one of the directors who does not advise his companions. The creation of officers, directors, &c., was by them. They, Sherman and Dean, had notice. The corporation was put into existence by them. They were the stockholders, and labored under no disability. Will a court of equity look at forms in total disregard of the substantial rights of parties? On the contrary, does not such a court always look at the real and undoubted merits of all controversies, unfettered by technical rules of law? Should this court determine that because they, Sherman and Dean,

472          MARYLAND REPORTS.

Hoffman Steam Coal Co. vs. Cumberland Coal & Iron Co.

have made such an arrangement as entitles them to certificates of stock on account of this land, the law will protect them, great injustice would be done the complainant. So far as they are concerned, they do not come into this court with clean hands; and no principle of equity justifies an interposition in their favor.

"Independent of the reasons already suggested, the defendants have to encounter that which is, to me, an insurmountable objection to the dissolution of the injunction. The motion to dissolve is made upon bill, answers and testimony. The bill of complaint does not call upon the defendants to answer under oath; nor were the answers read as evidence in the case. Under such circumstances, I cannot look to the answers, with a view of giving them the least efficacy as evidence, even though they may be directly responsive to the bill, which is in conflict with the practice and rule anterior to the statute of this State, and to which I will refer. If this court is forbidden to look at the answers as evidence, how can it be known that there are stockholders in the Hoffman Steam Coal Company, other than Sherman and Dean? the testimony of Shoemaker being obviously wholly insufficient for the purpose. The Act of 1852, ch. 133, provides, that 'no answer of any defendant to any bill or petition to be hereafter filed in a court of equity in this State, shall be evidence against a complainant or complainants, unless by the bill or petition such answer shall be required to be made under the oath of the respondent or respondents; or unless, at the hearing, the complainant or complainants shall read the answer as evidence; in which case it shall have the same effect, as to the party reading the same, as if it had been required to be made under oath.' According to the case of *Winchester & Lemmon vs. Balt. & Susq. Railroad Co.*, if the bill does not require the answer of the defendants to be under oath, the answer cannot be considered as evidence against the complainant, and, under the circumstances, the bill of complaint must be assumed to be correct. Such being the law, how can this court judicially know that any parties are the owners of stock, except Sherman and Dean, and they holding it fraudulently, as averred in the bill? The answers, I am

aware, state that innocent persons do hold stock, but who they are does not appear. But does not the Act of 1852 destroy the effect of the answers, and indeed is not such an averment or statement to be regarded as matter in evidence, and, to be available, necessary to be proved? It is believed that, by the recent case of *Warren vs. Twiley*, 10 *Md. Rep.*, 46, a different construction has been given to that Act. But an examination has satisfied me that the Court of Appeals did not design to impugn, in the least, the case to which I have adverted, but determines that the Act of 1852, in reference to the effect of answers as evidence, has not changed the practice as regarded the effect of an answer, when a cause at a final hearing is heard upon bill and answer. The case is not before me for final hearing. It is a motion to dissolve the injunction granted by this court. And whatever might be the effect of that motion, it still leaves the cause for a final hearing. All doubt, however, is removed from my mind by the case of *Taggart vs. Boldin & Thayer*, 10 *Md. Rep.*, 113, where the point in question is determined. In that case the bill did not call for an answer under oath; and for that reason it was not evidence in the cause, it not having been read as such by the complainant—and the case was determined by the averments of the bill and the testimony—the court regarding the case of *Warren vs. Twilley* as establishing that such would be evidence only when the cause is set down for hearing on bill and answer only.

"The next question is, as to the omission of necessary averments in the bill. The bill alleges the facts 'upon information and belief,' and for this reason it is insisted that the injunction should not have been granted, and should now be dissolved. I will not undertake to decide the question whether there exists in the bill and testimony sufficient to justify this court in the refusal to dissolve the injunction, as the complainant has made an application to amend the bill. Regarding the purchase as made by Sherman and Dean, from the facts now before me, as one that should be set aside, and that the complainant can so amend the bill as to obviate every objection on that account, the determination by me of the

law, in that respect, becomes unimportant. The court, in the exercise of a sound discretion, ought to allow the amendment, in order to remove the difficulty. I do not feel myself unaided by authority in coming to this conclusion; as the rule is not, as stated in argument, that the case must rest on the propriety of granting the injunction, on the equity appearing in the original bill. Before the Act of 1852, ch. 133, 'if the answer denied all the material allegations of the bill, yet, if it discloses an equity of which the plaintiff may avail himself by amendment, the injunction will be continued.' *Md. Ch. Prac.*, 87. 2 *G. & J.*, 3.

"For the reasons assigned in this opinion, I have decided that the complainant is entitled to relief, upon the bill and testimony now before me, having shown itself, *prima facie*, entitled to a decree. The property, the subject of the contract, should be protected against the wrongful acts of the defendants, pending the contest, and until that right is determined. *Geiger vs. Green*, 4 *Gill*, 473. If the defendants, owing to the relation they sustain to the complainant, have been guilty of fraud, in fact or by construction of law, and, for that reason, the deed to them should be vacated, I cannot readily conceive what injury will be inflicted upon them by the allowance of the amendment and the continuance of the injunction; for no one can doubt that, in the absence of process to prohibit the excavation of the coal, they would be responsible for all coal which might have been taken by them before the final decree of the court. And should the cause terminate in their favor, the law has provided all proper security, to indemnify them from all loss and damage. If, when an answer discloses an equity of which the complainant may avail himself by amendment, I can see no reason why such an amendment should not be permitted, when it is seen by the bill and testimony they have equity. All this court should desire is, to know that, *prima facie*, there exists such a state of facts as justifies the exercise of the equitable jurisdiction of this court. If the complainant is entitled to the land, it should be protected. The excavation of coal ought to be prevented. That is the thing which constitutes

its great value. And having shown, at this period of the cause, a right to the land, the defendants ought not to be permitted now to remove that which constitutes its real worth.

"It is also urged that the injury complained of is but a trespass or waste, and could not be prevented by an injunction. The general rule is well understood to be, 'that for mere acts of trespass, or for that which amounts to waste, the parties will be left to their remedy at law.' *Storm vs. Mann*, 4 *Johns. Ch. Rep.*, 21. *Amelung vs. Seekamp*, 9 *G. & J.*, 468. However, such is not the case when a trespasser digs into and works a mine to the injury of the owner, because it operates a permanent injury to the property as a mine; in short, it is now granted in all cases of mining coal, ores, and working quarries, when the party is a mere trespasser. 2 *Story's Eq., sec.* 929. *Livingston vs. Livingston*, 6 *Johns. Ch. Rep.*, 498.

"From these views, and having determined to allow the amendment when such shall have been made, I will then overrule the motion to dissolve."

An amended bill was then filed so as to charge, positively, what had been averred in the original bill only upon information and belief, and, also, so as to introduce the deeds of the 27th of September and the 1st of October 1857, which had been set up as a defence in the answers, and praying that they may also be declared fraudulent and void, and the same relief granted as to them as is prayed in the original bill with reference to the deed of the 22nd of April 1856, and for general relief. To this amended bill, answers were filed by all the defendants, relying upon all the defences which had been pleaded in the answers to the original bill. The Hoffman Steam Coal Company again moved to dissolve the injunction, and asked leave to take additional testimony, which was taken, and exceptions were filed by it to the averments of the original and amended bills, chiefly upon the ground that neither of them contain any allegations, whatever, that the deed of the 1st of October 1857, was fraudulent and void; nor any averments which would entitle the complainant to set it aside. This motion to dissolve was again heard, and,

on the 3rd of October 1859, the court passed an order continuing an injunction till final hearing or further order. The following is the opinion of the court, (PERRY, J.,) delivered upon the passage of this order:

"This case has already been decided by me, upon a motion by *all the defendants*, to dissolve the injunction. The opinion filed on the eighteenth day of May last, was upon the then existing facts. Since that time the complainant was permitted to amend its bill, by the averments or statement of circumstances, and making exhibits, which it deemed essential. To the bill thus amended, the defendants have answered, and the Hoffman Steam Coal Company, alone, has made a motion to dissolve the injunction; to sustain which, much testimony has been taken, and the cause has been argued; and I have been asked to grant the motion of the defendant; it being urged, that, so far as the Hoffman Steam Coal Company is concerned, it is not affected by those principles or rules of equity governing cases in which a motion is made by *all the defendants;* that that company is an innocent purchaser, without notice of any claim or interest on the part of the complainant; that having acquired a title from Dean, without such notice, this court ought not to pass any decree impairing it.

"If Dean were cognizant of the fact that Sherman was a director of the Cumberland Coal and Iron Company, at the time of his purchase, it may be doubted whether such a circumstance would not invalidate the contract. He, participating with one who is chargeable, at least, with constructive fraud, should be subjected to the same fate as his companion. Sherman being in a predicament which forbids his holding a title in hostility to the complainant, I doubt much whether Dean does not occupy the same relation. The reasons and authorities to which reference was made in my former opinion, by which I determine that Sherman could not assert such title, have recently been sustained in the case of *Cleveland vs. Rail Road Company*, reported in the *American Law Register*, vol. 7, No. 9, in which the doctrine is announced: 'That directors of an incorporated company are

trustees of the corporation. They are the vendors, dealing for the interest of the corporation, in making sale—the representatives of the company. Such persons cannot be permitted to purchase, when they have a duty to perform inconsistent with the character of a purchaser. That deeds, made by a company, in which the vendee is a director, could be set aside, by proceedings in equity, at the instance of the corporation.' The views I then entertained, in respect to that question, are still unchanged. It is not, therefore, necessary for me to reiterate the arguments to sustain them. They are found in the previous opinion. It has been, however, suggested, that in Maryland, a director of a corporation is not a trustee in such sense as to prevent his purchase of stock, or other property of the corporation; that thousands of dollars of bank stock are held by such title, and no one has ever supposed it to be defective; and that from an examination of authorities, it is, with confidence, asserted, that the principle governing all of them, is, that the same *natural* person can be both vendor and vendee, such as a trustee for sale; and in such case, his *cestui que trust* can have the sale set aside; so is a sale by guardian, or executor, who buys for himself; that such can be avoided, as a matter of right, upon the application of a person who stands in the position of beneficial owner of the property; that a director is not a trustee; he has not the legal title, nor, in contemplation of law, has he any influence upon the action of his co-directors, who are, each of them, presumed to act upon his own judgment; that a corporation is a legal entity, it acts through natural persons; but all its acts are corporate acts, and not those of individuals.

"The legal ability and earnestness with which these views have been pressed upon me, is my reason for their quotation. I have no doubt, much bank stock is held under the circumstances mentioned; but I hazard little in saying that, in most instances, that which may have been, originally, a doubtful title, has long since ripened into unquestionable right, by acts of confirmation or long acquiescence; and that I cannot but esteem the law to be, that stockholders or others, interested in such banks, might institute proceedings to set aside a sale

of stock made by directors to themselves, if done at a proper time; and that I am not aware of a decision in this State, impugning this view of the law. I would certainly regret to know such to be the case, especially in regard to the sale of real estate, as no one can fail to see that the temptation is so great that directors might, too readily, yield to its influence, particularly when they are not largely concerned as stockholders. The wisdom and policy of the law are too plainly seen by me, to justify a departure from that rule. Indeed, I can see in it much that protects and saves innocent persons. I regard it as one of the rules of equity, replete with good results. It is a barrier in the way of designing directors, 'delivering them from temptation,' and guards, in some degree, the rights of those whose interests they should hold sacred. Nor do I think it necessary to esteem the director a trustee. The authorities to which I have referred, in my former opinion, show that this doctrine applies to agents, attorneys and all persons acting for others. I will add to the authorities heretofore adduced, *Dart on Vendors,* 15, 16, 21.

"It is also urged, that one director has not, in contemplation of law, any influence upon the action of his co-directors. But does not the law contemplate the exercise of the sound, impartial judgment, opinion and views of each of that body, for the benefit of the stockholders? Can he place himself, with propriety, in a position in which he cannot advise or aid his companions? He should not be associated with directors, when, for purposes of personal aggrandizement, he can observe a studied silence, in respect to the affairs of the company. The corporation may be esteemed 'a legal entity;' but I know of no mode of giving them notice, except through natural persons. The directors and officers are the parties through whom the corporation is to be affected.

"That question which I esteem of the greatest importance in the cause, is, in regard to the effect of the defence by the Hoffman Steam Coal Company, that it is a *bona fide* purchaser without notice. As the decision of that question, with the complainant, may be regarded as a final determination of the motion to dissolve the injunction, I have given it much

consideration. In the argument, many authorities have been adduced to show, that to support the plea of a *bona fide* purchaser without notice, it must be shown, not only that the party had no notice of the complainant's rights, before the purchase, but that the purchase money was actually paid before such notice, and that, though the purchase money was secured, yet if, in fact, it was not paid before notice, it will not be sufficient to maintain the plea; that when it can be seen that the party cannot be injured, but the court can protect an innocent purchaser, who has not paid the entire sum or consideration for the land, the court will not esteem such a plea as sufficient to prevent a decree in behalf of a party who asks for the same. I do not hesitate to regard the law to be, 'that to enable a party to avail himself of such a defence, it is important and necessary for him to show an *actual payment of the whole purchase money.*' It must not be that security or an obligation for payment was given. 'The rule is, that such a defence, resting on the grounds of purchase without notice, must be full and specific, not resting on general terms.' It must be shown that the consideration of the purchase was valuable, and that actual payment was made before notice, and to whom so made. This is the law, as maintained in England and in this country. 2 *Leading Cases in Equity*, 77. 7 *Johns. Ch. Rep.*, 65, *Jewett vs. Palmer.* 2 *Daniells' Ch. Practice*, 776. 3 *Sugden on Vendors*, 312. It is essential, not only that a conveyance should be made, but that the *whole* purchase money should be paid; and relief will be denied if notice be given, while the contract is incomplete, in that respect. *Price & Bevans vs. McDonald, et al.*, 1 *Md. Rep.*, 422. *Wormley vs. Wormley*, 8 *Wheat.*, 421. 3 *Sugden on Vendors*, 312. *Dart on Vendors*, 389. If this were a controversy between the complainant and Sherman and Dean, as defendants, and no conveyance had been made by them, by which a title was communicated to the Hoffman Steam Coal Company, I suppose no question could be made in regard to their rights. They could not claim to be *bona fide* purchasers. They have not paid the whole purchase money. They paid a part, and have agreed

to pay the interest on the bonds of the company, and when due, the principal. The rule of law, which would require them to show a payment of the whole purchase money, to avail themselves of such a defence, is too well established by the authorities, to which I have referred, to be now questioned. I regard it also as well settled, that a purchase, by a party, with notice of the claim or rights of a third person, equally binds such vendee; that if the Hoffman Steam Coal Company had knowledge that their grantors had not paid the whole purchase money, they are equally bound, and will be subject to the same equities; that a purchaser, with notice of a right in another, is, in equity, liable to the same extent, and in the same manner, as the person from whom he made the purchase. For instance, if a person contracts to sell an estate, or to grant leases thereof, a purchaser, with notice of such contracts, is liable to the same equity, stands in the same place, and is bound to do that which the vendor, whom he represents, would be bound to do by decree. 2 *Leading Cases in Equity, White & Tudor,* 130.

"The law being such, what is the condition of the Hoffman Steam Coal Company? The deed of Sherman and Dean to that corporation, refers to the deed from the Cumberland Coal and Iron Company; in which last instrument the consideration is stated to be, the payment of twenty-eight thousand dollars, and the sum of one hundred and twelve thousand dollars, *to be paid* by Sherman and Dean, by paying and satisfying one hundred and twelve bonds, for one thousand dollars each, on the first day of January 1864, and interest, semi-annually, on the first day of July and January, in each year until that period. The deed from Sherman and Dean to the Hoffman Steam Coal Company, also contains an agreement, that the company will pay the interest on the one hundred and twelve bonds, as it becomes due, and the principal of said bonds, in exoneration of all liability of said Sherman and Dean for payment of the same. Nothing is better established than that a purchaser will have constructive notice of everything which appears in any part of the deeds or instruments, which prove and constitute the title

purchased, and is of such a nature that, if brought home to his knowledge, it would amount to actual notice; for the right of a purchaser can, in no case, go beyond his own title, and whatever appears on the face of the title papers, forms an integral part of the title itself. Such notice, therefore, is of the most conclusive nature, and is not susceptible of being explained away or refuted. And when, therefore, its existence appears from the documents or papers accompanying the answer, it will overrule a positive denial of notice in the answer itself. So a general recital in a deed, that there were mortgages on the estate, was held to affect parties claiming under the deeds with notice. *Neale vs. Hagthorp*, 3 *Bland*, 551, 586, and 1 *G. & J.*, 270. 2 *Leading Cases in Equity*, 133, 134, 153. The deed to the Hoffman Steam Coal Company, as before stated, making such a reference to that from the Cumberland Coal and Iron Company to Sherman and Dean, its grantors, no one can doubt, in the least, that the most complete and ample notice has been given of such facts, as show that there still remain unpaid, one hundred and twelve bonds, each for one thousand dollars; and the law being, as before shown, that if the purchase money is not paid, a notice before that period prevents a vendee from resorting, successfully, to the plea of a *bona fide* purchaser without notice. The Hoffman Steam Coal Company cannot, upon that ground, ask the interposition of the court to dissolve the injunction.

"I do not deem it necessary, when deciding the motion to dissolve the injunction, to determine the various exceptions filed on the part of the defendant. on the 21st of July last, as the practice is to continue the injunction, 'if the answer discloses an equity, of which the complainant may avail himself by amendment.' *Maryland Chancery Practice*, 87. 'And the absence or want of a party as defendant is generally no ground upon which to claim a dissolution of an injunction. A necessary party may be supplied before final hearing; and it is the constant aim of courts of equity to do complete justice, by deciding upon and settling the rights of all parties interested in the subject-matter of the suit. But this

may be obtained by having the necessary parties before the court, at any time before the final decree is passed.' *Lucas vs. McBlair,* 12 *G. & J.,* 2. I can see no reason why an objection on account of the want of necessary parties cannot be sustained, with as much propriety as the exceptions made in this cause. Conceding the exceptions to be good, (which I do not determine,) the complainant can amend before final hearing in this case. There is no reason apparent to me, why the amendment should not be allowed as well in the one case as in the other. Indeed I find the law to be, that courts of equity are not debarred, by any inflexible rule, from awarding or continuing an injunction, even in the face of a positive denial, in the answer, of the equity of the bill; and may take any course necessary for the remedy or preventive of irreparable injury to the interest of a suitor, should the right finally prove to be with him, although denied, *in limine,* on the other side. The main distinctions which seem supported by authorities, or, at least, by the weight of authorities, appear to be, that in cases of special injunction, if the whole merits are satisfactorily denied by the answer, the injunction is undeniably dissolved. But there are exceptions to the doctrine, and these are fairly resolvable into the principle of irreparable mischief, such as cases of asserted waste, &c. In cases of this sort, the court will look to the whole circumstances, and will continue or dissolve the injunction in the exercise of a sound discretion; 'and a doubt, in point of law, will furnish a sufficient ground against dissolving an injunction.' 2 *Leading Cases in Equity,* 111, 112, 113. The value of the property in controversy consists mainly in its coal, and I could not, in the exercise of a sound discretion, give the defendant a right to excavate and sell it. The interest to be paid on the bonds is so small a sum, compared to the value of the coal, which may be taken from the mines and land, and the property, in my opinion, might be so much impaired in value, by the license, as to inflict ultimate injury upon the complainant.

"From the views above expressed, it can readily be seen, that there is nothing remaining for me to do but to pass a de-

cree, overruling the motion made by the Hoffman Steam Coal Company, to dissolve the injunction in this case."

The Hoffman Steam Coal Company then appealed from the two orders, of the 25th of May and the 3rd of October 1859, and also from the order granting the injunction.

The cause was argued before LE GRAND, C. J., ECCLES-TON and BARTOL, J.

*Wm. Schley,* for the appellant:

1st. The complainant had undoubted legal capacity to enter into the transportation contract, and sell and convey its lands. It had the same power to sell its lands as any other owner of real estate, and its ability to make the transportation contract, if any express grant of power was necessary, is clearly conferred by secs. 5 and 6 of the Act of 1852, ch. 93. 1 *Ves. & Beames,* 226, 244, *Mayor &c. of Colchester vs. Lowten.* The fact that Sherman was a director of the complainant, at the time of the transaction, did not render him *incompetent* to enter into this contract, or to purchase the lands and receive a conveyance therefor. *Angell & Ames on Corp.,* 205, 206, and the various cases there cited. In the absence, therefore, of *fraud in fact,* (of which there is no proof,) the *legal title* in the land, and *legal rights* under the contract, became completely vested *at law* in both Sherman and Dean. 76 *Eng. C. L. Rep.,* 200, *Foster, et al., vs. Oxford Railway Co.* This is also conceded by *Lord Lyndhurst* and *Lord Brougham* in 1 *Macqueen,* 474, 482. In *equity,* (in the absence of fraud in fact,) dealings between a *trustee* and *cestui que trust,* are not regarded as void, *ab initio,* but merely as *voidable* at the election of the *cestui que trust: binding,* nevertheless, on the trustee, unless avoided by the *cestui que trust;* and capable of being rendered *unavoidable,* even by the *cestui que trust,* by confirmation, by ratification, by estoppel, and even by acquiescence. 3 *G. & J.,* 163, *Richardson vs. Jones.* 4 *G. & J.,* 379, *Williams vs. Marshall.* 12 *Md. Rep.,* 417, *Keighler vs. Savage Manf. Co.* 5 *H. & J.,* 147, *Davis vs. Simpson.* 9 *Ves.,*

234, 246, *Coles vs. Trecothick.* 2 *Bro. Ch. Cases,* 200, *Fox vs. Mackreth.* 12 *Ves* , 372, *Morse vs. Royal.* 5 *Ves.,* 678, *Campbell vs. Walker,* and the various cases there cited in note (*a.*) Upon the proof in this cause, even as between the complainant and Sherman and Dean, the former had no equity, when this bill was filed, to avoid the contract and deed, either wholly or in part, on the ground that Sherman was a director of the complainant when the transaction took place. The parties dealt at arms length, fairly, honestly and openly. The transaction, in its origin, was unimpeachable. If, however, it could have been avoided upon election, promptly made and notified, yet the right to do so was abandoned by the various acts and conduct of the complainant in relation to the transaction. 88 *Eng. C. L. Rep.,* 341, *Reuter vs. Electic Telegraph Co.* The same reason may be applied, as well to the case between the complainant and Sherman, as between the complainant and Dean; but even if the complainant had an equity, when the bill was filed, as against Sherman, clearly as it respects Dean it had none. Sherman and Dean had separate rights and separate interests. Sherman was purchaser of five, and Dean of three, undivided parts of the land, the whole into eight parts to be divided; and they were interested in the same proportion in the contract of transportation. Dean never was a director, and never knew, until after this bill was filed, that Sherman ever had been a director of the complainant. Sherman and Dean were tenants in common, and had several estates. *Crabbe on Real Property,* 2316. *Allnutt on Partition,* 129. If, therefore, the views already presented be well taken, then both Sherman and Dean, when they sold, conveyed and assigned to the appellant, had not merely a good marketable title, but a clear and perfect title both at law and in equity, and upon this hypothesis, the title of the appellant would be perfect in its entirety. But at all events, the appellant would have a perfect title to, at least, three undivided eighth parts, independently of all other considerations in support of its title. It is clear that if the appellant had *only* the good title of *Dean,* still it was rightfully in possession of the

*whole,* as the shares were undivided. The injunction, there-fore, in this aspect of the case, was too broad. Unless *actual ouster* of another tenant in common be averred and proved, there is no *trespass* and no wrong, and no ground for *injunc-tion.* 2 *Arch. N. P.,* 313. 1 *Salk.,* 192, *pl.* 4. 1 *East.,* 568, *Peaceable vs. Read, et al.* 2 *H. & McH.,* 254, *Lloyd vs. Gordon.* The pretence that Dean was a mere represen-tative man was intended to obviate this point. But it is de-nied on oath. The *onus probandi* is on the complainant. All the presumptions are with Dean. *Best on Presumptions,* 59, 69.

2nd. But the appellant was a *bona fide* purchaser from Sherman and Dean, without notice of any equity in the part of the complainant. The three recorded deeds were notice of a good title in Sherman and Dean. They were in actual possession as owners, exercising dominion as such, engaged in excavating coal and sending it to market. The complain-ant had done no act to declare its election to avoid the con-tract of transportation, or to disaffirm the sale of the land. On the contrary, the complainant, in accordance with the contract, was carrying over its railroad for Sherman and Dean, the coal by them excavated, and was receiving pay-ment for so doing, under the contract. By the recorded title papers, Sherman and Dean were the actual *legal* owners. By peaceable possession they were ostensibly undisputed owners. By its acts and conduct, the complainant held them out as the real and *bona fide* owners. 5 *Ves.,* 680, *Camp-bell vs. Walker.* 12 *Ves.,* 372, *Morse vs. Royal,* and cases in notes. 4 *G. & J.,* 375, *Williams vs. Marshall.* 12 *Md. Rep.,* 383, *Keighler, et al., vs. Savage Manf. Co.,* and cases there cited. The pretence, that because Sherman took part in the organization of the appellant and was constituted one of its directors, and, therefore, the appellant is to be charged with notice, as a corporation, of every fact within the knowledge of Sherman, is not supported by the established rules of law. It is very clear that Sherman and Dean, when they sold the land and their interests under the transportation contract, for a certain number of shares of stock, were acting

for *themselves*, and not for the *appellant*. If the rule be of *universal* application, that the knowledge or fraud of a director shall be considered as the knowledge or fraud of the corporation, how can the complainant rely on the alleged fraud of Sherman, when dealing with it for this property, as he was then a director of the complainant. The true rule is that, in order to affect a corporation with the knowledge of a director, he must be acting, at the time, in the business of the corporation, and in his capacity as a director. The rule has no application where he is dealing on his own account, and not *for* but *with* the corporation. *Angell & Ames on Corp.*, 299, 301. *Story on Agency*, sec. 140, *b*. 3 *Md. Ch. Dec.*, 381, 387, *United States Ins. Co. vs. Shriver.* 4 *Md. Rep.*, 239, *Winchester vs. Balt. & Susq. Railroad Co. Hill on Trustees*, 510, 507, *note* 1. 28 *Eng. Law & Eq. Rep.*, 77, *Barnhart vs. Greenshields. Parson's Merc. Law*, 150, and cases there cited. Nor is the pretence of any value, that the counsel who prepared the articles of incorporation had notice of the relation which Sherman sustained to the complainant. He was acting on behalf of Sherman. In fact he never became counsel for the appellant till after this suit was brought. 13 *Ves.*, 120, *Hiern vs. Mills*, and cases there cited. The learned judge who heard the case below, in his opinion, lays down as a rule of law applicable to this case, that the appellant is not entitled to the protection of the plea of being a *bona fide* purchaser without notice, because, as he supposes, the whole consideration of the purchase had not been paid. But, it is respectfully insisted, he was wholly mistaken as to the fact. As between the parties to the transaction, that is to say, as between Sherman and Dean *as vendors* and the appellant as *purchaser*, the *whole* consideration was *fully* paid. The land was sold, *cum onere*, precisely as it was owned by Sherman and Dean, viz., subject to the payment of the 112 bonds and the interest thereon; and for the land thus subject to a lien, and for the assignment of the transportation contract, a stipulated number of shares of stock were to be given, and the full number of shares are accordingly given. As between the parties the

transaction was completely executed. Sherman and Dean, by their conveyance and assignment, *parted* with all their estate and interest in the land and in the contract, and received all they were entitled to receive from the appellant. If the doctrine, as supposed by the learned judge, was applicable to a case of this character, then it would not be competent for a party to rely on this defence, where the subject-matter was a particular estate, or was any interest less than an unincumbered fee-simple. It would exclude property subject to a ground-rent, rent-charge, or any incumbrance whatever.

3rd. But even if, on any ground that has been suggested, the title of the appellant in its origin was not unimpeachable by the complainant, yet the conduct of the complainant subsequently must effectually debar it from successfully impugning the title of the appellant, whatever its rights may be as between it and Sherman and Dean, or either of them. The sale by Sherman and Dean to the appellant was completed on the 20th of August 1858. This bill was not filed until the 6th of December 1858. In the meantime, as shown in the evidence, the complainant recognized the appellant as owner of the land and as assignee of the contract—transported its coal, excavated from the mines on this land, and received payment under the contract of transportation; and during the same period numerous transfers of stock were made. It would be a practical fraud, not merely on the appellant in its corporate capacity, but upon *bona fide* holders of its stock, if the complainant, after acquiescing in the sale to Sherman and Dean for more than two years and a half, were permitted to elect to consider the same as void, even if as between it and Sherman and Dean, it could, at some former period have honestly made such election. By non-action, by *laches*, by acquiescence, by active proceedings, the complainant authorized *all the world* to suppose that it recognized and considered the deeds and contract as valid. *Zabriskie vs. Cleveland, Columbus and Cincinnati Rail Road Co.*, 23 *How.*, 381.

4th. If the preceding views, or any one of them that will

protect the title of the appellant, can be maintained, then, upon the pleadings in the cause, and upon the evidence now before the court, it follows as a necessary consequence that the injunction, *as respects the appellant,* ought to be dissolved. In a case like this, the injunction is merely ancillary to, and is strictly dependent upon, the principal relief which is sought by the bill. 4 *Gill,* 472, *Geiger vs. Green.* 4 *Md. Ch. Dec.,* 57, *Walker vs. House.*

In addition to the preceding points, which relate to the merits of the controversy between the parties to this appeal, it is further insisted:

1st. The bill upon its face showed that the appellant was in actual possession of the land, claiming derivatively from the complainant itself, by a paper title *prima facie* good. There are no charges of insolvency of the defendants, no allegations of irreparable loss, nor is any state of case shown from which irreparable injury would naturally or necessarily result, and all material averments which could be relied on in support of the injunction, are stated on the basis of information and belief. It was not, therefore, a case for an interlocutory injunction. 6 *Ves.,* 51, *Pillsworth vs. Hopton.* 8 *Ves.,* 89, *Smith vs. Collyer,* and cases there cited.

2nd. But even if the injunction was properly granted, on the filing of the bill, yet upon the motion to dissolve, after the answers were filed, and upon the proof then taken, the injunction ought not to have been continued, and the order of the 25th of May 1859, was erroneous. By the Act of 1853, ch. 344, sec. 2, the answers of the defendants being under oath, were of the same force and effect, as evidence, as the bill. *Bouldin vs. Mayor & C. C. of Balt.,* 15 *Md. Rep.,* 18. *Gelston vs. Rullman,* 15 *Md. Rep.,* 260. And it is insisted that the proof then taken did not sustain the averments of the bill, but actually supported the answers of the defendants. 7 *Md. Rep.,* 537, *Feigley vs. Feigley.* And the further evidence taken after the answers to the amended bill, greatly strengthened the case of the appellant, and the order of the 3rd of October 1859, was more strikingly erroneous. On the merits, the injunction ought to be dissolved. But

even if this position, in its whole extent, cannot be maintained, yet it is certainly well taken as to the defendant Dean, and as to the appellant to the extent of its title as derived from Dean.

3rd. The original bill did not notice the deeds of the 24th of September and the 1st of October 1857, and although the amended bill alleges the *factum* of these deeds respectively, and prays that the same may be declared fraudulent and void, ·yet there are no allegations in the amended bill impeaching these deeds, or either of them. Exceptions were taken to both the original and amended bills in this respect. Now the conveyance to the appellant by Sherman and Dean is expressly grounded on their title under the deed of the 1st of October 1857. It is very manifest that that deed might be good and valid, and unimpeachable by the complainant, even if the deed of the 22nd of April 1855, could have been avoided.

*Geo. A. Thruston* and *Geo. W. Dobbin,* for the appellee:

1st. A trustee cannot become a purchaser, either directly or through the agency of another, of pro·erty confided to him for sale, and under the application of this rule, Sherman being a director of the appellee and chairman of the committee of six, appointed, on his own motion, to ascertain what land could be advantageously sold, and of the subcommittee of three, who actually visited the land to make such ascertainment, and reported thereon, was incompetent to purchase this land, and the sale to him is, therefore, void. 4 *H. & McH.,* 11, *State vs. Reed.* 4 *H. & J.,* 192, *Singstack vs. Harding.* 5 *H. & J.,* 148, *Davis vs. Simpson.* 3 *G. & J.,* 163, *Richardson vs. Jones.* 4 *G. & J.,* 376, *Williams vs. Marshall.* 3 *H. & J.,* 427, *Dorsey vs. Dorsey.* 7 *G. & J.,* 1, *Callis vs. Ridout.* 12 *Md. Rep.,* 416, *Keighler, et al., vs. Savage Manf. Co.*

The cases in respect to purchases by the trustee of the trust estate, or contracts with him affecting its interest, naturally divide themselves into two general classes:

1st. Cases in which a trustee buys or contracts with him-

62    v.16

self, or several trustees of which he is one, or a board of trustees of which he is one.

2nd. Cases in which a trustee buys or contracts with his *cestui que trust*, who is *sui juris*, and competent to deal independently of the trustee in respect to the trust estate.

In the first class of cases, the purchase or contract is voidable at the option of the *cestui que trust*, without reference to the fairness or unfairness of the purchase or contract. The disqualification of the party purchasing or contracting, is a conclusion of law and is absolute. The right of the *cestui que trust* to come in as of course, and set aside a sale made by a trustee to himself, though made at public auction, *bona fide*, for a fair price and without showing actual injury, is fully considered and affirmed by this court, in *Mason vs. Martin & Kemp*, 4 *Md. Rep.*, 135. See, also, 2 *Johns. Ch. Rep.*, 252, *Davoue vs. Fanning*. 4 *How.*, 503, *Michoud vs. Girod*, and notes by English and American editors to *Fox vs. Mackreth* in *White's Eq. Cases*; 65 *Law Lib.*, 126, *et seq.*, where a large collection of the cases on the general subject will be found.

In the second class of cases, the presumption of law is against the validity of the transaction, with degrees of strength varying according to the circumstances, but the trustee is permitted to show affirmatively the fairness of the transaction, and to establish the other conditions necessary to its validity. 65 *Law Lib.*, 146, and cases cited in *notes*. 6 *Ves.*, 627, *Lacey, ex-parte*.

So great is the jealousy with which the dealings of a trustee with his *cestui que trust* are regarded by courts of equity, so strong is the presumption of fraud which has been applied to such cases, that the distinction here drawn is not always recognized by the elementary writers, (*Story's Eq., sec.* 311,) or by the judges, (2 *Hare*, 60, *Edwards vs. Meyrick*,) but the principle of positive incapacity is applied to this second class of cases as well as to the first. See, also, 9 *Ves.*, 247, *Coles vs. Trecothick. Ibid.*, 296, *Hatch vs. Hatch.* 12 *Ves.*, 372, *Morse vs. Royal*.

The rule, however applicable to the second class of cases,

throws upon the trustee the *onus* of rebutting the legal presumption against the transaction, and of proving affirmatively the conditions necessary to give it validity.   If no such proof is established, courts of equity will treat the case as one of constructive fraud.   *Story's Eq.*, sec., 311.   10 *Ves.*, 427, *Randall vs. Errington*.   3 *Mylne*, 113, *Hunter vs. Atkins*. 2 *Hare*, 60, 68, *Edwards vs. Meyrick*.   65 *Law Lib.*, 146. These conditions are:

1st.  That the *cestui que trust* knew that he was dealing with his trustee, and had agreed to discharge him from that relation and capacity.   10 *Ves.*, 426, *Randall vs. Errington*.   *Story's Eq.*, sec. 316.   65 *Law Lib.*, 130.   6 *Ves.*, 627, *Lacey, ex-parte*.   9 *Ves.*, 234, *Coles vs. Trecothick*.

2nd.  That the trustee had communicated all the information which he possessed, or could acquire, to the *cestui que trust*.   8 *Ves.*, 348, *Ex-parte James*.   9 *Pick.*, 234, *Farnam vs. Brooks*.   14 *Ves.*, 300, *Huguenin vs. Baseley*.   6 *Ves.*, 280, *Gibson vs. Jeyes*.   15 *Ves.*, 40, *Harris vs. Tremenheere*.   11 *Paige*, 541, *Howell vs. Ransom*.   65 *Law Lib.*, 137, 146.   *Story's Eq.*, sec. 316, *a.*   3 *Swanst.*, 73, *Walker vs. Symonds*.

3rd.  That the trustee derived no advantage whatever from his situation as trustee, or from any knowledge acquired in that character.   3 *Mylne & Keene*, 113, *Hunter vs. Atkins*. 65 *Law Lib.*, 146, 371.

4th.  That the trustee had advised his *cestui que trust* in the same manner as if the dealing of the latter had been with a third party.   65 *Law Lib.*, 133, 146.   6 *Ves.*, 278.   3 *Mylne & Keene*, 113.

5th.  That the price was fair, the consideration adequate, and the whole bargain just and reasonable.   65 *Law Lib.*, 146.   6 *Ves.*, 280.   16 *Ves.*, 512, *Peacock vs. Evans*.   2 *Hare*, 68.   4 *Dessausure*, 652, *Butler, et al., vs. Haskell. Story's Eq.*, sec. 321.

The principle has been held to apply to trustees, agents, executors, administrators, assignees for creditors, sheriffs, auctioneers, agents for sale, cashiers of banks, directors of corporations, and to all persons who have any general duty, or

492      MARYLAND REPORTS.

Hoffman Steam Coal Co. vs. Cumberland Coal & Iron Co.

special duty, in respect to the transaction. 65 *Law Lib.*, 137. 3 *Beav.*, 49, *Greenlaw vs. King.* 9 *Paige*, 241, *Van Epps vs. Van Epps. Ibid.*, 663, *Torrey vs. Bank of Orleans.* 1 *Sandf. Ch. Rep.*, 225, *Dickinson & wife vs. Codwise. Ibid.*, 257, *Cram vs. Mitchell.* 4 *H. & J.*, 332, *Smith vs. Baldwin.* 7 *G. & J.*, 1, *Callis vs. Ridout.* Nor does it make any difference though the purchase were at public auction, or even under the direction of a master. 65 *Law Lib.*, 128. The principle applies equally where the trustee is not the sole purchaser, but is merely interested with others, (3 *Dana*, 266, *Mitchum vs. Mitchum*,) for in either case, his interest, which is to buy cheap, is in conflict with his duty, which is to get the best price for his *cestui que trust*, and the policy of the law which establishes the rule is equally violated; see, 1 *Macqueen*, 473, *Blaikie vs. Aberdeen Railway Co.*, a case strongly relied on by the appellees. The rule has also been applied equally where the purchaser was one of several trustees who made the sale. *Story on Agency*, sec. 211. 3 *Brown's Ch. Rep.*, 483, *Hall vs. Noyes.* 3 *Ves.*, 740, *Whichcote vs. Lawrence.* 3 *Sandf. Ch. Rep.*, 592, *Ward vs. Smith.* 1 *Paige*, 393, *Case vs. Obeel.* 65 *Law Lib.*, 141. 1 *H. & G.*, 11, *Ringgold vs. Ringgold.* 7 *G. & J.*, 1, *Callis vs. Ridout.*

The directors of a corporation are agents of the company, and, as such, have duties to discharge of a fiduciary nature towards their principal, and are subject to the obligations and disabilities incident to that relation. 3 *Paige*, 331, *Robinson vs. Smith. Angell & Ames on Corp.*, (*Ed. of* 1858,) sec. 312, *page* 365, and cases there cited. 3 *La. Rep.*, 568, *Percey vs. Millandon.* 1 *Rhode Island Rep.*, 321, *Hodges vs. New England Screw Co.* 1 *Craig & Phillips*, 1 *Atty. General vs. Wilson. Redfield on Railways*, 494. 1 *Younge & Coll.*, 325, *Benson vs. Heathorn.* 16 *Beav.*, 485, *York & North Midland Railway Co. vs. Hudson.*

A director purchasing of, or contracting with the board of which he is a member, falls within the first class of cases above mentioned; he is an agent or trustee dealing with several agents or trustees, of whom he is one; he is under a

positive legal incapacity so to deal with any binding effect upon the company; he can so buy or contract only subject to the right of the company, at its option, to disaffirm the contract and have the sale set aside without reference to the fairness or unfairness of the transaction. The relation of the director to the stockholder is the same as that of the agent to his principal, the trustee to his *cestui que trust,* and out of the identity of these relations springs the same duties, the same dangers, and the same policy of the law. The number of the directors or trustees do not give such security as to justify an exception to the rule. But the true answer to this suggestion as to numbers, is, that *every* director and *every* trustee owes the *entire* duty belonging to that character. Each director is bound to give to his co-directors, and through them to the company, the full benefit of all the knowledge and skill which he can bring to bear upon the subject; to advise and assist according to the best of his ability. The company contracts for this service, not from a part, but from all the directors, and they contract to render it. If any one of them, while this relation continues, shifts his position from a protector to an adversary, it is as clearly a violation of his duty and of the rights of the company as if he were sole trustee. Experience shows that there is in practice, at least, as much danger of abuse and wrongs by directors towards the stockholders, as in any other class of trusts, while the vast amount of property involved in the administration of these great corporation trusts, and the large number of individuals interested in them as stockholders, makes the application of the settled principles of equity to these cases, a matter of great public importance and necessity, and there is no reason, whatever, nor any safety in relaxing, in respect to them, the rules which have become established in the courts as maxims of public policy. 1 *Macqueen,* 471. 3 *Ves.,* 751, *Whichcote vs. Lawrence.*

The case of an agent for sale buying the trust estate is regarded with especial jealousy, and as calling for a very stringent application of the rule. The foundation of this disposition is the opportunity he has of acquiring information

which he may use for his own benefit, and the difficulty of ascertaining whether he has made the necessary disclosures. 65 *Law Lib.*, 137, 128, 141. *Story on Agency, sec.* 211. *Ross on Commercial Law,* 101, 9 *Law Lib.*, 213. *Dunlap's Paley's Agency,* 33.

As to *confirmation* of actual or constructive frauds, or of acts of persons in confidential relations: the rules of law, applicable to such cases, are much more strict than in the ordinary dealings between independent and equal parties, where there is a merely technical defect of power, or where it is the policy of the law to uphold the transaction. In all dealings between persons in confidential relations, or having just emerged from them, the policy of the law is to look with great suspicion on the transaction. In the classification of the books, such transactions, however innocent, are called constructive frauds. For a general and succinct statement of the conditions necessary to make a confirmation valid, see *Lewin on Trusts,* 390, also *Ed. of* 1857 of same book, *page* 778.

1st. The *onus* of proving all the conditions necessary to make a valid confirmation, is upon the party claiming its benefit. *Hill on Trustees,* 827. 2 *Mylne & Keen,* 232 *Bennet vs. Colley.*

2nd. The confirmation must have been given by a party *competent* to make a valid act of confirmation, not by a person not *sui juris,* or a minor, &c. *Lewin on Trusts,* 390. If the confirmation be by a body of the stockholders, it must be shown that those who united in the act were competent to bind the others. Is not the assent of all required in such a case? See, as to creditors, 2 *Johns. Ch. Rep.,* 264, *Davoue vs. Fanning. Ex-parte James,* 8 *Ves.,* 337, and *Lewin on Trusts,* 391, as to a class of persons and *laches* as applicable to them. Should not specific and definite notice that the matter was to be acted on, be required to bind a minority in respect to a transaction so much out of the ordinary course of business, and with a person in a situation of trust and confidence? Does not the duty of disclosure require that a trustee, participating in calling a meeting at which he intends

to seek a ratification of such a transaction, should give express notice to the stockholders that the matter was to be acted on? Would any thing less than such notice be *uberrima fides*? It is the better opinion, that even the common law rule, in cases where the charter is silent, requires, that if the corporation is composed of a definite number, a majority of all the stockholders is necessary to form a quorum. *Angell & Ames on Corp., (Ed. of* 1858,) *sec.* 501. But in the present case the charter is not silent. It expressly requires (Act of 1840, ch. 214, sec. 5) that for any purpose, except the election of directors, a quorum shall consist of the owners of a majority of the stock, in person, or represented by proxy.

3rd. The act of confirmation must be *deliberate, plain* and distinct, (12 *Ves.*, 337, *Morse vs. Royal*,) with knowledge that it will have that *effect*, (2 *Sch. & Lef.*, 474, *Murray vs. Palmer*,) and with *intent* that it should have that effect. *Beatty*, 413, *Molony vs. L'Estrange.*

4th. The confirmation must *not* have been made in *pursuance* of the original transaction, (18 *Ves.*, 125, *Wood vs. Downes*,) or under the *influence* of that transaction, (1 *Ves., Jr.*, 215, *Crowe vs. Ballard*,) or of the *same circumstances* which produced that transaction, (18 *Ves.*, 125; 1 *Ball & Beatty*, 338, *Roche vs. O'Brien;* 17 *Ves.*, 25, *Gowland vs. De Faria*,) otherwise it will not be a confirmation but merely a continuation of the original fraud. *Lewin on Trusts*, 391. 2 *Ball & Beatty*, 317, *Dunbar vs. Tredennick.*

5th. The party giving the confirmation must have done so after having full knowledge of his *legal rights*, of his power to *disaffirm* the former transactions, and to be *relieved therefrom* on application to a court of equity. *Lewin on Trusts*, 390. *Hill on Trustees*, 525. *Story's Eq.*, sec. 345. 1 *Russ. & Mylne*, 425, *Cockerell vs. Cholmeley.* 1 *Hoff. Rep.*, 280, *Fish vs. Miller.* 2 *Ball & Beatty*, 317. 2 *Sch. & Lef.*, 474. 2 *Mylne & Keene*, 242, *Bennet vs. Colley.* 1 *Ves., Jr.*, (*Sumner's Ed.*,) 220, and *notes.* 2 *Dev. Ch. Rep.*, 195, *Boyd vs. Hawkins.*

6th. The party giving the confirmation must have done so after having *full knowledge* of all the *material facts* of the

case. 1 *Hoff. Rep.*, 280. 9 *Pick.*, 234, *Farnam vs. Brooks.* 1 *Simmons*, 89, *Austwick vs. Maddeford. Lewin on Trusts,* 390, and cases there cited. *Hill on Trustees*, 525, 527. 65 *Law Lib.*, 165. 2 *Sch. & Lef.*, 474. 2 *Dev. Ch. Rep.*, 195. 1 *Russ. & Mylne*, 425. 2 *Gill*, 170, *Bell vs. Webb & Mong.*

When a trustee seeks from his *cestui que trust* a confirmation, the same principles apply as in any other dealing between such parties, and all the rules heretofore stated become applicable to the attempted confirmation; all the conditions in respect to disclosure, to take advantage of his situation to advise, and to adequacy of consideration, are to be proved affirmatively by the trustee, as in any other case of such dealings.

Applying these principles to the facts of this case, the counsel argued at length, that the original transaction, the *conveyance* of the lands and the *transportation contract*, was invalid; that Sherman bore such relation to the appellee as rendered him *incompetent* to purchase from or contract with the appellee; that the rule of absolute disability to buy of, or contract with the board of directors, of which he was one, applied to him; that it is impossible to find any parallel in the reported cases, or to imagine an instance more illustrative of the necessity of the rule of absolute disability, or calling more urgently for its application, without reference to the actual terms of the transaction, or the actual frauds by which it was effected; that the inadequacy of consideration far transcends any of the cases to be found in the books, and was in fact *total*, and that the sale and contract, if sustained, would be *ruinous* to the company; and that there was no such confirmation of the transaction as to bind the appellee. They further cited, as to inadequacy of price, 1 *Story's Eq.*, sec. 246; 1 *Brown's Ch. Rep.*, 8, *Gwynne vs. Heaton;* 3 *Cow.*, 523, *Seymour vs. Delancey; Hilliard on Vendors,* 356. They also argued that the allegations of the bill, as to *actual fraud*, were sustained by the proof of positive and material misrepresentations, and fraudulent and corrupt practices, by which the transaction was accomplished and the

conveyance and contract obtained, and the conduct of Sherman and his confederates, throughout the whole affair, was tainted with fraud, and dishonestly, deliberate and designed. They also further argued, that Dean is shown by the evidence to have had such complicity with Sherman, that he stands in no better position, and gets no better title than Sherman.

2nd. The formation of the Hoffman Steam Coal Company was but a contrivance to cure, by the creation of a pretended *bona fide* purchaser without notice, a title originally defective. The company thus formed, was not real and *bona fide*, but simulative, and the conveyance to it did not substantially change the ownership as it before existed. But this new company *had notice* of all the facts connected with the title. 2 *White & Tudor's Lead. Cases,* 123, *Le Neve vs. Le Neve.* Again, this company has not paid the purchase money and cannot claim the benefit of a *bona fide* purchase without notice, except upon proof of the payment of the consideration in full. 2 *White & Tudor's Eq. Cases,* 112. 8 *Wheat.,* 449, *Wormley vs. Wormley.* 1 *Md. Rep.,* 422, *Price & Bevans vs. McDonald.* The contract for transportation is a *chose in action,* and is not a subject for the application of the rule as to *bona fide* purchasers without notice. 2 *White & Tudor's Eq. Cases,* 85, 215. 4 *Cowen,* 717, *Hawley vs. Cramer.* 10 *G. & J.,* 420, *Jones vs. Hardesty.* The defence is not sufficiently pleaded. 2 *White & Tudor's Cases,* 77. Again, if these objections be out of the way, still the Hoffman Steam Coal Company is identical with Sherman and Dean. To raise the question of *bona fide* purchaser without notice, there must be a *vendor* distinct from the *purchaser*—there must be two parties and a transfer from one to the other. Here the parties are the same and not different *in interest* from Sherman and Dean. What consideration does this new company give? None whatever. The subscription of this land constitutes the whole stock of the company; it had nothing to give but a certificate that it held the land for the benefit of those from whom it *received the land.* Something must be parted with in the shape of consideration, which was not done here. The nominal stockholders were

the mere agents of Sherman and Dean.   As a payer of value or as a purchaser, this new company has, therefore, no standing in court.   But if it had, it *had notice* through Sherman, who was a director therein, and also through his counsel, who prepared its articles of incorporation.

3rd. The appropriate remedy for a wrong like this, is a bill in equity to set aside the conveyance of the land and the contract for the transportation of coal, and praying an injunction to restrain the defendants, in the meantime, from alienating, incumbering or working the lands and mines, and transferring the stock, &c.   3 *Daniell's Ch. Prac.*, 307.   2 *Story's Eq.*, secs. 954, 929.   4 *Eng. Law & Eq. Rep.*, 175, *Shrewsbury R. R. Co. vs. Birmingham R. R. Co.* 18 *Ves.*, 184, *Thomas vs. Oakley.* 6 *Johns. Ch. Rep.*, 497, *Livingston vs. Livingston.*   The present motion to dissolve being made by one of the defendants alone, the Hoffman Steam Coal Company, it can take no benefit from the answers of its co-defendants, but must stand on its own, and the equity of the complainant's bill must be taken as proved against the defendants who have not appealed.   *As to the* Hoffman Steam Coal Company, the equity of the bill cannot be and is not denied, except upon information and belief, and its defence rests entirely upon new matter in avoidance. Under such circumstances an injunction will not be dissolved on motion, but will be continued till final hearing.   2 *White & Tudor's Eq. Cases*, 110, 111, 112.   3 *Ired. Ch. Rep.*, 170, *Lyrely vs. Wheeler. Ibid.*, 576, *Kerns vs. Chambers.* 2 *Dev. & Batt. Ch. Rep.*, 13, *McNamara vs. Irwin.* 12 *G. & J.*, 244, *Hutchins vs. Hope.* 2 *Johns. Ch. Rep.*, 202, *Roberts vs. Anderson.* 1 *Green's Ch. Rep.*, 439, *Chetwood vs. Brittan.   Adam's Eq.*, 356, and *notes.* 2 *H. & J.*, 36, *Lynch vs. Colegate.* 1 *Bland*, 335, 336, *Chase vs. Manhardt.*

4th. The exceptions to the sufficiency of the averments of the original and amended bills ought not to be sustained, because the averments are sufficient to show a title to be relieved by injunction, the rule being, that if the bill shows a case, which, though not sufficient in its then form *to entitle* the complainant to the final relief asked, yet may be made

so by proper amendments, and taken in connection with the answer as a mere pleading, shows a case for equitable interference by injunction; the injunction, having been granted, will be continued, and the proper amendments allowed to be made before final hearing. 3 *Ired. Ch. Rep.*, 390, *Smith vs. McLeod. Act of* 1854, *ch.* 230. The several deeds subsequent to that of the 22nd of April 1856, were all made in execution of one and the same contract of sale, and are merely confirmatory of the original deed.

LE GRAND, C. J., delivered the opinion of this court:

This is an appeal from an order granting an injunction, and from a subsequent order continuing the same, upon the hearing of a motion to dissolve, passed by the Circuit court of Allegany county, in an equity cause therein depending, in which the Cumberland Coal and Iron Company was the complainant, and Allen M. Sherman, William B. Dean, and the Hoffman Steam Coal Company, were defendants. The motion to dissolve was made by all the defendants, and, being overruled in the opinion of the court, after an amendment was made to the bill of complaint, the formal order was filed, the amended bill having been answered by all the defendants. The Hoffman Steam Coal Company, alone, appealed.

The object of the bill is, to cause to have declared null and void certain deeds of lands from the complainant to Messrs. Sherman and Dean, and the cancellation of a contract, entered into with them by the complainant, for the transportation of coal, &c., over a railroad belonging to the latter. And, also, to procure a transfer of the aforesaid lands to the complainant, the same having been conveyed, as also the contract of transportation, to the appellant. The bill prays an accounting on the part of the defendants, as to the coal, &c., which have been mined and transported from the lands mentioned in the proceedings; and, also, an injunction restraining the disposition and sale of any of said lands, the stock of the appellant, or the transfer of the contract relating to transportation.

The whole equity of the complaint rests on two principal

allegations. *First,* fraud, *in fact,* on the part of Sherman and Dean in their dealings with the property of the complainant; and, *second,* that if there be no such fraud, in fact, as to vitiate the whole transaction, the *law,* under the circumstances of this case, imputes such knowledge to the appellant of the relation of Sherman to the complainant and the course of his proceedings, as will affect its title with whatever infirmity belonged to his title.

The principal and operative facts detailed in the bill of complaint, may be thus stated:

The complainant was incorporated by the State of Maryland, at December session 1840. Andrew Mehaffey was its president from the 20th of March 1854 to the 7th of June 1858. Sherman became a director, by an election to fill a vacancy, on the 21st of February 1855, and continued to be such until the 29th of May 1858. On the 4th of April 1855, Sherman was appointed chairman of a committee to prepare by-laws, and as such, on the 4th day of June 1855, reported to a meeting of stockholders, that an executive committee should be created, to be constituted of three directors, two of whom to form a quorum, the committee to be appointed exclusively by the president; that in pursuance of the authority conferred upon him by the adoption of the report, the president, Mehaffey, appointed Messrs. Sherman, Francis Bloodgood and Joseph Torrey, an executive committee, and, as such, they assumed to act on the 29th of May 1858, but they never kept any record of their proceedings. That, on the 9th of October 1855, Sherman, at a meeting of the board of directors of the complainant, held in the city of New York, proposed for the adoption of the directors, which was done, the following resolution: "Resolved, that the president appoint a committee of five directors, whose duty it shall be to proceed to the company's property in Maryland, and ascertain how much and what part of their lands can be sold without interfering with the working and facilities of the company; and if practicable, that they apportion and set-off, by metes and bounds, such portions as they, in their judgment, shall deem advisable, and report the result of their commission to this board at the

earliest day practicable." Sherman was appointed chairman of the committee, having associated with him on it, Joseph Torrey, M. N. Falls, William Petit and Francis Bloodgood. This committee was appointed by the president, Mehaffey, who, on motion, was added to it. Only Sherman, Mehaffey and Petit acted and visited the lands. On the 11th of December 1855, they made a report recommending a sale of a portion of the lands of the complainant; a resolution was passed authorizing a sale of land for $200,000. On the 15th of January 1856, another resolution was passed, which, after referring to that of the 11th of December, and declaring its execution to have been found impracticable, proceeds as follows: "It is understood that a sale of a less quantity of land, for $150,000, or thereabouts, may be effected, which sale, it is believed, will accomplish all the ends, &c.; therefore, resolved, that the president and secretary be, and they are hereby authorized and directed to make such sale, by executing a deed of the land to be sold, and to make and execute such covenants and agreements, on the part and in the behalf of this company, and as they may deem necessary to accomplish the ends above mentioned. *Resolved,* that the president be, and he is hereby authorized to modify the terms and conditions of such sale, in his discretion, if he shall deem it necessary to the accomplishment of such sale."

On the 22nd of April 1856, at the city of New York, a deed of conveyance of certain lands belonging to the complainant, and therein described, and a certain agreement relating to transportation, were executed and delivered by Mehaffey, as president, to Sherman and Dean. This transaction was, on the 13th of May 1856, reported to a meeting of the directors of the Cumberland Coal and Iron Company, and according to the minutes of its proceedings, "after explanations" it, as well as the acts of the president and secretary, were, by the board, "unanimously approved," and a copy of the deed, together with the agreement entered into, directed to be placed on file for future reference.

On the 19th day of August 1858, the Hoffman Steam Coal Company of Allegany county was formed, under the Act

of Assembly, of this State, of 1852, chapter 322. On the 20th of August 1858, Sherman and wife, and Dean, conveyed to the Hoffman Company, the land which had been conveyed by Mehaffey to Sherman and Dean, and, according to the bill, were about "to execute and deliver to the said company an assignment of the aforesaid contract for transportation, or other instrument purporting to impart to the said company, rights under and by virtue of the said contract." The bill alleges the capital stock of the Hoffman Company to consist of five thousand shares, of which, they charge, "on information and belief," Sherman and Dean became subscribers to the number of four thousand nine hundred and ninety shares; that Sherman was a subscriber for about five-eighths of the shares, and Dean for about three-eighths of the shares; and that the other two shares were nominally taken by other parties for the purpose of enabling the said parties to participate in the formation of the said company and become directors thereof. The bill charges, that Sherman, in the form of stock issued by the Hoffman Company, still retains his interest in the lands mentioned in the deed executed by the president of the complainant, and also, in the contract of transportation, and that he retains possession of the deeds and contract; that he is an officer as well as director of the company, and has and exercises entire practical control of the company, and that the change or conversion of his ownership in the lands into an interest in the stock, is a fraudulent device, for the purpose, and with the design, of evading the jurisdiction and process of the court. It also charges, that the Hoffman Company had, before the execution and delivery to the said company of the deed by Sherman and Dean, and before its agreement to purchase the lands thereby conveyed, and before the formation of any contract, whereby the said company was to acquire or enjoy any of the advantages conferred by the said contract for transportation, and that the defendant Dean also had, before he entered into the purchase of the lands, or into the contract for transportation, full notice of the frauds in said sale, in the procurement, origin, formation, execution and delivery of the deed, and of

the contract for transportation, and of all the facts relating thereto.

In addition to the fraud alleged in the procurement of the deed and contract by Sherman, the bill alleges, the price agreed to be paid for the land to be grossly inadequate, and the terms of the contract of transportation to be ruinous to the Cumberland Coal and Iron Company. It also denies there has been a payment according to the terms of the purchase, and asserts that Dean was but a mere "representative man," by which is meant one without pecuniary substance.

The gravamen of the bill is, that Sherman, with others, but principally with Mehaffey, conspired to despoil the complainant of its property by proceedings conducted by them, as its officers, and that full knowledge of all the facts and circumstances was had by the Hoffman Company, Sherman being, practically and really, the company; and that, whether or not there be sufficient evidence of fraud in fact on the part of those charged with it, nevertheless, in the contemplation of the law, the transaction is such as will be declared null and void, and of non-effect, on grounds of public policy.

Sherman and Dean, in their answers, deny all fraud, the latter disclaiming all knowledge of Sherman or of his transactions until he became connected with the purchase of the land. The Hoffman Company in its answer, sworn to by its president, S. Brooke Postley, admits the formation of the company, and that Sherman and Dean conjointly took the capital stock thereof to the extent of 4990 shares, and avers that the other ten shares were, at the same time, subscribed for by other parties, and denies that it is true that the said ten shares were nominally subscribed for by said other parties, and says they were paid for by such other parties, and were not subscribed for on behalf of Sherman and Dean or either of them. It states that Sherman and Dean have since sold, actually and *bona fide*, a large part of their stock, so that they are not the large holders they originally were. It denies the frauds alleged in relation to the conveyance and contract of transportation, and insists, that even if they existed, the company had no knowledge of them, but became the purchaser of said property,

and assignee of said contract of transportation, *bona fide* and for a full and valuable consideration. It admits the mining of coal on the property, and sets up, as a confirmation of the original deed and contract, the fact of the receipt by the complainant of the price of transporting under the contract.

A great deal of testimony was taken, on the side of the complainant, to show, what is alleged to be, the unconscionable character of the contract, and that what was done at the meeting of the stockholders of the Cumberland Coal and Iron Company, held on the 1st of June 1857, other than the voting for president and directors, was unauthorized, and that of 27,997 votes cast, 22,508 were given by proxy; that the parties voting by proxies were only empowered to vote for president and directors, and several parties were examined to show, that they, as stockholders, had no knowledge whatever of the conveyance to, and contract with Sherman and Dean, and never intended to ratify them. It is not necessary the testimony, on the one side or the other, should be critically examined, inasmuch as, on this appeal, the chief inquiry will be, whether the Hoffman Company has a standing in court as an independent litigant, and as a *bona fide* purchaser for value, and without notice of the circumstances preceding and conducing to its acquisition of title.

Much was said, and earnestly said, in argument, in impeachment of the integrity of the actors in these transactions, and, especially, in the arraignment of the honesty of Sherman and Mehaffey; fraud, studied and systematic, was imputed to them throughout the whole of their dealing with the matters involved in this controversy. Whatever may have been their true motives of action, the facts disclosed in evidence do not demand that we should brand them as wilfully dishonest. One of the most distinctive features in the history of the development of the mineral regions of our State has been, the insane spirit of speculation which has characterized it at almost every step. Honest men, as well as dishonest men, uninfluenced by the disastrous failures of their predecessors, have, from time to time, embarked in enterprises under the delusive hope of speedily, and as it were by magic,

Hoffman Steam Coal Co. *vs.* Cumberland Coal & Iron Co.

realizing princely fortunes, and have only been awakened to a sense of the unreality of their calculations and hopes, by the crash occasioned by their utter prostration and ruin. This spirit of wild speculation ordinarily blinds those who are engaged in it, and subjects them to the condition in which they are unable to see things as others see them. Legal disabilities rarely occur to them; it being, with most of them, an axiom of public or political economy, that the exchange of one article for another, at fictitious rates, and without the bestowal of labor on either, increases the value of both. Men, involved in transactions of this kind, very frequently, without the slightest consciousness of dishonesty of purpose, do things which the law condemns, and which it declares to be of no value. It is to guard against this proneness to a non-observance of what is strictly right and proper in the dealings of corporations, the law has wisely interposed its checks and prohibitions; and, we think, in the present aspect of this case, these are all sufficient to justify the action of the Circuit court, without staining the reputation of any of the parties to the controversy with fraud or perjury   Uprightness and integrity of character are too precious a possession to be dealt with lightly anywhere, and ought not especially, to be sullied by the judgment of a court of justice, except on clear and conclusive evidence.

The first matter of inquiry is, the nature and legal effect of the transactions of Sherman with the Cumberland Coal and Iron Company.

The whole evidence incontestibly establishes these facts:

1st. That Sherman was a director of the Cumberland Coal and Iron Company, from the 21st of February 1855, to the 29th of May 1858.

2nd. That, on the 9th of October 1855, on motion of Sherman, a committee was appointed to visit the lands of the company in Maryland, and report on the expediency of selling a portion of them, and of which committee he acted as chairman, and, as the organ of which, he recommended a sale, &c., &c.

3rd. That, on the 22nd of April 1856, Sherman received

64      v.16

the deed to himself and Dean for the land, and the contract relating to the transportation over the railroad of complainant.·

It thus appears that Sherman was a director in the Cumberland Coal and Iron Company, from the incipiency of the project to dispose of a part of its property down to its consummation, and so remained for more than two years thereafter.    He actively participated in all measures tending to the completion of the sale, and, of course, had full knowledge of all the circumstances attendant on its progress.    About this the documentary proof allows of not a shadow of doubt.

Under this state of case the question is, whether Sherman was competent to become a purchaser of the property of the plaintiff.

In considering the capacities of a trustee to purchase the property of his *cestui que trust*, the authorities regard them under two classifications: *first*, where a trustee buys or contracts with himself, or several trustees, of which he is one, or a board of trustees; *second*, where the dealing of the trustee is with a *cestui que trust*, who is *sui juris* and competent to deal independently of the trustee in respect to the trust estate.

Whether the transactions of Sherman be considered, under the one or the other head, is immaterial so far as this appeal is concerned, for, in our judgment, in either case, they cannot be upheld if resisted.    The distinction between the two classes of cases consists in this: that in the *first*, the contract is voidable *absolutely* at the instance of the *cestui que trust*, without regard to its fairness; whilst in the *second*, although the presumptions of the law are against the contract, yet, permission is given to the trustee, to show the perfect *bona fides* of the transaction and circumstances relieving it from the censure of the law.    This is a distinction recognized in most of the books, but, it is not universally so.    So far from it, some of the cases insist, with great earnestness, that the governing principle ought to be, and is, the same in both cases It is not necessary we should investigate the solidity of this last mentioned doctrine; for, whether the dealings of Sher-

man belong to the one or the other class, they equally fall under the correction of a court of equity.

The necessity of *good faith*—and that free from suspicion, as far as practicable--between the principal and agent, is the main pillar of support to the doctrine; the necessity of it underlies all the decisions. Remembering the weakness of humanity, its liability to be seduced, by self-interest, from the straight line of duty, the sages of the law inculcate and enjoin, a strict observance of the divine precept: "Lead us not into temptation."

In this State, as elsewhere, it is well settled that trustees cannot purchase at their own sales, either directly or indirectly, and if they do, such purchase will be set aside, on the proper and reasonable application of the parties interested. *Richardson vs. Jones*, 3 *Gill & Johnson*, 184. This doctrine, which is applicable to trustees, applies also to purchases by persons acting in any fiduciary capacity, which imposes upon them the obligation of obtaining the best terms for the vendor, or which has enabled them to acquire a knowledge of the property. The authorities supporting it are numerous and uncontradictory; they will be found brought together to a considerable number in the notes to the case of *Fox vs. Mackreth*, 1 *White & Tudor's Leading Equity Cases*, 105. A director in a company holds such a relation to its stockholders. The House of Lords, in the case of the *Aberdeen Railway Company vs. Blaikie*, 1 *Macqueen Rep.*, 461, held that a contract, entered into by a manufacturer for the supply of iron furnishings to a railway company of which he was a director, or the chairman, at the date of the contract, was invalid, and not enforceable against the company; and *Lord Cranworth*, in delivering the opinion, said: "A corporate body can only act by agents, and it is of course the duty of those agents so to act as best to promote the interests of the corporation, whose affairs they are conducting. Such an agent has duties to discharge of a fiduciary character towards his principal, and it is a rule of universal application, that no one having such duties to discharge, shall be allowed to enter into engagements in which he has, or can have, a per-

sonal interest conflicting, or which possibly may conflict, with the interests of those whom he is bound to protect. So strictly is this principle adhered to, that no question is allowed to be raised, as to the fairness or unfairness of a contract so entered into. It obviously is, or may be, impossible to demonstrate how far, in any particular case, the terms of such a contract have been the best for the *cestui que trust*, which it was possible to obtain. It may sometimes happen, that the terms on which a trustee has dealt, or attempted to deal, with the estate or interests of those for whom he is a trustee, have been as good as could have been obtained from any other person; they may even, at the time, have been better. But still so inflexible is the rule, that no inquiry on that subject is permitted. The English authorities on this subject are numerous and uniform." The same views are expressed in the case of *Michoud vs. Girod*, 4 *Howard*, 503, a case elaborately discussed by counsel and court. "The rule," say the court, "embraces every relation in which there may arise a *conflict* between the duty which the vendor or purchaser owes to the persons with whom he is dealing, or on whose account he is acting, and his own individual interest."

These citations are sufficient to show, that the dealings of the defendant, Sherman, with the property of the complainant, fall directly within the prohibition of the rule, and, as a consequence, obnoxious to disavowal.

But, it is said, however this may be, the whole transaction was fully ratified and confirmed by the complainant, which ratification and confirmation relieved it from all legal infirmity. An attentive consideration of its whole history, as detailed in the record, has not brought us to this opinion. The law governing questions of ratification, in cases like the present, is well settled. To render the act of ratification effective and conclusive, certain considerations are necessary. At the time of the supposed ratification, the principal must have been *fully* aware of every material circumstance of the transaction, the real value of the subject of the contract, and his act of ratification must have been an independent and substantive act, founded on complete information, and of

perfect freedom of volition. And, in addition to all this, the *cestui que trust* must not only have been acquainted with the facts, *but apprised of the law, how those facts would be dealt with if brought before a court of equity.* Lewin on Trusts, (*Ed. of* 1858,) *page* 615.

This last requisite, it is nowhere shown in the proof, has been complied with. But, on the contrary, it is fairly to be inferred that the stockholders believed they were concluded by what had been done, and this inference is particularly strengthened by the circumstance, that the modification in the contract of transportation was solicited and granted, not as a matter of right, but as a concession on the part of the beneficiaries under it. In this view, it is not necessary we should dwell more fully on the other facts attending the negotiation and sale. Such commentary properly belongs to the final hearing.

As to Dean, it is only necessary to observe, that it is impossible to believe he was ignorant, when he became associated in the transaction, of the fact that Sherman was a director in the Cumberland Coal and Iron Company. We cannot suppose him to have become a party to a contract, involving enormous sums of money and great liabilities; without some knowledge of the existence and organization of the corporation, with which he was dealing to so great an extent. Imputing to him the possession of ordinary intelligence, and judging of his transactions by the rules which usually influence human conduct, when taken in connexion with all the facts and circumstances surrounding him, we are led to the conclusion, that he had knowledge of the relation which Sherman bore to the Coal and Iron company, and is, therefore, affected with whatever of legal disability belonged to Sherman, by reason of that relation.

But it is urged that however defective the title of Sherman and Dean may, under the circumstances, have been, the title of the Hoffman Steam Coal Company of Allegany is, nevertheless, good and free from blemish, it having been acquired *bona fide* and without notice.

In view of the *facts* of *this* case, it is immaterial to in-

quire, what would be the principles applicable to a case in which the defendant had, in point of fact, become possessed of title *bona fide*, and without notice of the circumstances impairing that claimed by those from whom it was derived. The facts of this case are too palpable to allow of conjecture; and they all show that, whatever knowledge Sherman had, must have been possessed by the Hoffman Steam Coal Company of Allegany county. This company was incorporated under the act of 1852, on the 19th of August 1858, and, on the day following, the deed was made to it in pursuance, clearly, of one entire plan. Sherman and Dean becoming the owners of 4996 of the five thousand shares, into which the capital stock was divided; it was, in fact, but a contrivance, whereby the same property was held by the same parties, but under a different name. The testimony of Shoemaker shows, that his ownership of one share was unreal; that he never did pay for it, and that his participation in the organization of the company was merely to oblige other parties, towards whom he held friendly relations; and, notwithstanding the statement of Postly to the contrary, it is no violent presumption, that others, whose names were used in the organization of the company, occupied the same relation to it as did Shoemaker. If the facts of this case were deemed insufficient to establish notice, then, it is difficult, if not absolutely impossible, to imagine a combination of circumstances adequate to such a result. The whole case shows, that in the early stages of the existence of the appellant, so far as its property and transactions were concerned, it and Sherman were one and the same. In conveying to the Hoffman Company he was but conveying to himself.

It appears, from the evidence, that some of the shares in the stock of the Hoffman Steam Coal Company were held by other persons than Sherman and Dean, prior to the sixth day of December 1858, the date of the filing of the original bill, and, it is contended, that as to them, they being *bona fide* holders without notice, the objections urged against Sherman and Dean are not applicable. There is no doubt that where a purchaser, with notice from a trustee, conveys for

valuable consideration to another person, who has no notice of the trust, the estate will not be affected with the trust in the hands of the second purchaser. *Hill on Trustees*, 516, (*marginal.*) But, as to shareholders so situated, there is no question presented by this appeal. It is only as to the right of the appellant to ask a reversal of the order of the court, that we are now called upon to decide. We need not, therefore, look into the testimony for the purpose of discovering what number, if any, shares of stock were held by innocent parties before the filing of the bill.

We think the objections to the sufficiency of the bills of complaint were properly disposed of by the judge of the Circuit court. The charge of fraud is made specifically, and the invalidity of the deeds given subsequently to that of the 22nd of April 1856, is assailed on the same ground as is that.

We are of opinion there is an abundance in the case, as now made, to justify the continuance of the injunction until final hearing, and we accordingly affirm the orders of the Circuit court of the 25th day of May 1859, refusing to dissolve the injunction, and, also, the order of the third day of October 1859, overruling the motion, *made by the appellant*, to dissolve the injunction.

*Orders affirmed.*

(Decided July 13th, 1860.)

ECCLESTON, J., delivered the following opinion:

Without deciding whether, at the time Dean became first associated in the transaction mentioned in the proceedings, he was or was not ignorant of the fact that Sherman was a director in the Cumberland Coal and Iron Company, I think there is enough shown by this record to authorize the court, in the exercise of its equitable discretion with regard to the dissolution of injunctions, to continue the present injunction until the final hearing. And, therefore, I concur with my brothers in affirming the orders appealed from.