HARFORD P. JENKS, Trading as the Hook Patent
Kiln Company,

vs.

CLAY PRODUCTS MANUFACTURING COMPANY
et al.

———

CLAY PRODUCTS MANUFACTURING COMPANY
et al.

vs.

HARFORD P. JENKS, Trading as the Hook Patent
Kiln Company,

*Construction of Contract—Transfer of Control—Forfeiture—
Acquiescence—Equity—Administers Full Relief—
Remand by Appellate Court.*

Where, as a result of installment payments on the cost of
constructing additions to a brick plant being in arrears, the
contractor and the owner made a supplementary contract by
which the contractor was to have possession and control of the
plant and business until the amount due· was paid "either by
profits of the plant" or "by sale of capital stock," *held* that the
contractor was not entitled to retain possession of the plant and
business, without completing the additions to the plant, until
he had received in net profits or otherwise the full contract
price of the additions, with interest thereon, the original con-
tract having clearly contemplated the prompt construction of
the additions, and the supplemental contract declaring that it
was not to modify or affect the original contract.     pp. 569-571

Defendant having acquired possession of plaintiff's manufac-
turing plant and control of its business, under certain contracts,
for the purpose of erecting additions to the plant, and of secur-
ing payment of the amount which plaintiff agreed to pay for
such additions, he forfeited these rights of possession and con-
trol by refusing to proceed with the erection of the additions,

and plaintiff was entitled to an injunction to prevent defendant from interfering with plaintiff's control of the plant and business.    p. 572

Equity having properly assumed jurisdiction for the purpose of enjoining defendant, who was in possession and control of plaintiff's plant and business under a contract which had terminated by forfeiture, from further interfering with plaintiff in the management of the latter's plant and the control of its business, it could retain jurisdiction for the purpose of administering full and complete relief, although plaintiff could have recovered the real property in ejectment and the personal property in replevin.    p. 572

Where a court of equity assumes jurisdiction on other grounds, and where the defendant has refused to perform an essential part of an entire and indivisible contract, the court, in order to administer full and complete relief, may cancel the contract.

p. 573

A contract for the construction of additions to a brick plant, and a subsequent contract giving to the contractor the possession and control of the plant until he received the sums stipulated in the first contract to be paid him, *held* together to constitute an entire and indivisible contract.    p. 574

One who refuses, without any legal excuse for so doing, to perform an entire and indivisible contract, cannot recover, in either general or special assumpsit, any part of the compensation agreed upon, or for the work done in part performance of the contract.    p. 574

Plaintiff having put defendant in possession and control of its brick plant and business, to be retained by the latter until he received the amount due him under a previous contract for the construction of additions to the plant, and plaintiff having thereafter without success urged him to complete these additions, and to furnish a statement as to what was due him, which he refused to furnish unless assured that defendant would pay the entire amount which he claimed to be due him, *held* that, under the circumstances, a delay in bringing suit to recover possession and control of the plant and business, after defendant's forfeiture of his rights thereto, did not amount to such acquies-

cence by plaintiff in defendant's conduct, as to deprive the former of its right to recover control of the business, or to require it to pay any part of the consideration of the contract which defendant failed and refused to perform.          pp. 574, 575

Where the case was heard in the lower court on a motion to dissolve an injunction previously granted, and was not submitted for final decree, the Court of Appeals, in reversing an order making the injunction perpetual, will remand the case in order that the court below may pass an order overruling the motion to dissolve and continuing the injunction until final hearing.                    p. 576

*Decided June 27th, 1921.*

Appeals from the Circuit Court for Talbot County, In Equity (ADKINS, C. J.).

The causes were argued together before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, and OFFUTT, JJ.

*Isaac Lobe Straus,* with whom were *Alfred L. Tharp* and *J. Fletcher Clark* on the brief, for Harford P. Jenks.

Injunction is not a proper remedy for the recovery of possession of real property or personal property. *Mountain Lake Park* v. *Shartzer,* 83 Md. 10; *Lewis* v. *Levy,* 16 Md. 85; *Chappell* v. *Cox,* 18 Md. 513; *Bernei* v. *Sappington,* 102 Md. 185; *Welde* v. *Scotton,* 59 Md. 72; *Phelps' Juridical Equity,* Sec. 179, p. 258; *Miller's Equity Procedure,* Sec. 571, p. 678; *Whalen* v. *Delashmutt,* 59 Md. 253-254; *Banks* v. *Busey,* 34 Md. 439-440; *C. & P. R. Co.* v. *Pa. R. Co.,* 57 Md. 271-276; *Hotel Co.* v. *Engraving Co.,* 92 Md. 710; *Salmon* v. *Clagett,* 3 Bland, 125, Brantly's Note; *Insurance Co.* v. *Selig,* 81 Md. 200; *Lacassagne* v. *Chapins,* 144 U. S. 124; *Black* v. *Jackson,* 177 U. S. 349.

The plaintiffs had no possession for Jenks to interfere with. And before Jenks could interfere with the plaintiffs' possession, they had to be put in possession, and until they were put in possession the injunction must be totally nugatory.

Furthermore, before the plaintiffs could be put into the possession which the injunction is asked to protect from interference, Jenks, who was in possession, had to be put out of possession. Jenks had the possession lawfully obtained under the plaintiff's contract and with their full consent. Neither do plaintiffs help the matter any by calling Jenks a trespasser. He is not a trespasser. His original entry was lawful and by consent and under a written contract which still gives him a right to hold this property. Injunction does not lie to prevent a trespass ordinarily. Unusual circumstances of damage must be shown to authorize its use for that purpose, but in this case there is and can be no trespass. He is in possession under a contract with plaintiffs' consent. He claims the contract still entitles him to retain possession, a question which can be as well tried at law in an ejectment proceeding as in equity in an injunction proceeding.

Cancellation is decreed only when a contract is void for some equitable reason, and not simply where somebody fails to carry it out. *Cohen* v. *Numsen,* 104 Md. 676; *Conner* v. *Groh,* 90 Md. 674; *Smith* v. *Humphries,* 104 Md. 285; *Ranstead* v. *Allen,* 85 Md. 482.

The plaintiff corporation and its co-plaintiff, White, are not entitled to equitable relief in this case because the record shows that their hands are stained with fraud and wrong and also because, though seeking equity, they refuse to do equity. He who comes into equity must come with clean hands. *Phelps' Judicial Equity,* Secs. 156, 257; 1 *Pomeroy Eq. Jurisprudence,* Sec. 397; 21 *Corpus Juris,* title Equity, pp. 180-183; *Lord* v. *Smith,* 109 Md. 42; *Harton* v. *Little,* 188 Ala. 640; *Dilly* v. *Barnard,* 8 Gill & Johnson, 187; *Roman* v. *Mali,* 42 Md. 514; *Brown* v. *Riley,* 72 Md. 489; *Hall* v. *Robinson,* 51 Md. 345; 350.

*Wm. Mason Shehan* and *Addison E. Mulliken,* with whom were *Nehemiah E. Clark, Charles J. Butler, Seth, Shehan & Marshall* and *Mulliken & Porter* on the brief, for Clay Products Manufacturing Company *et al.*

The contracts of January 27th and May 3rd to erect a dryer and kiln are, when taken together, an indivisible and an entire contract. That contract is not a series of divisible, separate contracts for the doing of separate, independent acts. It was the manifest intention of the parties that it should be one entire contract and not a series of independent contracts. *Brantly, Contr.,* p. 403; *Galvin* v. *Prentice,* 45 N. Y. 16; *More* v. *Luther,* 153 Mich. 206; 18 L. R. A. (N. S.) 149; *Johnson* v. *Fehsefeldt,* 106 Minn. 202; 20 L. R. A. (N. S.) 1070; *American Towing Co.* v. *Baker-Whitely Co.,* 111 Md. 502.

The contract being an entirety, it was the duty of the defendant to erect a complete kiln and dryer. This the defendant failed to do. The contract has not been abandoned or rescinded by the parties, nor have the plaintiffs prevented performance. It follows, therefore, where the contract is entire in its nature, no recovery can be had until performance has been completed. The same result is reached upon another principle, *i. e.,* if the undertakings on the one side and those on the other are dependent, the contract cannot be enforced unless performance is averred by one party or prevented by the other party. Thus the defendant's legal position is untenable because, on the one hand, he cannot enforce the contract owing to his failure of performance, and, on the other hand, because of this inability, the complainants have all the advantage which they could have derived from a simple rescission. *Brantly, Contracts,* p. 403; *Coates* v. *Sangston,* 5 Md. 21; *Watkins* v. *Hodges,* 6 Harris & J. 38; *American Towing Co.* v. *Baker-Whitely Co.,* 111 Md. 502; *Coburn* v. *Hartford,* 38 Conn. 290; *Bleistein* v. *Studer,* 3 N. Y. S. 1; *Howe* v. *Carpenter,* 53 Barb. 382; *Oldewurtel* v. *Bevan,* 117 Md. 645; *Denmead* v. *Coburn,* 15 Md. 44; *Gill* v. *Vogler,* 52 Md. 663; *Meyer* v. *Fenkil,* 113 Md. 36.

Though the performance by Jenks has been partial, still under the circumstances of this case, the part unperformed and abandoned was such that the object of the contract has been defeated or rendered unattainable, making the default a

total one. It cannot be compensated for in damages, as practically no benefit has been received from the contract. *Cases collected, Brady* v. *Oliver,* 125 Tenn. 595; 41 L. R. A. (N. S.) 60; 1913 C *Ann. Cas.* 376.

The right of rescission arises not only upon conduct of the defendant, inconsistent with the contract, but upon conduct of the defendant to the contract inconsistent with an intention to be bound any longer by the contract. The defendant's act in removing the structural equipment showed such an intention, and the admission of such an act is sufficient to authorize this honorable Court to annul the contract. *Dermott* v. *Jones,* 2 Wall. 8; *U. S.* v. *U. S. Fidelity & Guar. Co.,* 236 U. S. 512; *Fidelity Trust Co.* v. *American Surety,* 175 Fed. 200; *Bartlett* v. *Bisbey,* 66 S. W. Rep. 70.

As the money received according to the provisions of the contract of May 3rd is to be considered as payment in lieu of instalments that were to be paid under the contract of January 27th according to the progress of the construction of the kiln and dryer, the law in reference to the return of instalments applies in this case, where we ask for the return of all money received under the contract of May 3rd. The rule is this: That a contract for the complete construction of a building for an entire price, payable in instalments as the work progresses, is an entire contract, and a refusal by the contractor to complete the building, entitles the owner to a return of the instalments paid. *Dermott* v. *Jones,* 2 Wall. 8; *U. S.* v. *U. S. Fidelity, etc., Co.,* 236 U. S. 512; *Janes* v. *Scott,* 59 Pa. 178; 98 Am. Dec. 328; *Union Trust Co.* v. *Citizens Trust Co.,* 185 Pa. 217; *Fidelity Trust Co.* v. *American Surety Co.,* 175 Fed. 200; *Public Schools* v. *Bennett,* 27 N. J. L. 513; *Thompkins* v. *Dudley,* 25 N. Y. 272; *Bartlett* v. *Bisbey,* 66 S. W. 70.

A mere permission to occupy the land of another for any purpose is a license and not a lease. *Delittle* v. *Eddy,* 7 Barb. 74; *Lowell* v. *Strahan,* 145 Mass. 1; *Druce* v. *Wheeler,* 22 Mich. 439.

And one who extends his license beyond the scope essential to the enjoyment of what is expressly granted is a trespasser *ab initio*. *Gardner* v. *Rowland*, 24 N. C. 247; *Freeman* v. *Headley*, 33 N. J. L. 523; *Clough* v. *Hosford*, 6 N. H. 231; *Wendell* v. *Johnson*, 8 N. H. 220; *Reed* v. *Merrifield*, 10 Metc. (Mass.) 155; *Doolittle* v. *Eddy*, 7 Barb. (N. Y.) 74; *Missecker* v. *Monn*, 36 Pa. St. 313.

Where a trespass works a destruction of the estate in the character in which the complainant was entitled to enjoy it, a proper case is presented for relief by injunction. *Baltimore Belt R. R. Co.* v. *Lee*, 75 Md. 600; *Scully* v. *Rose*, 61 Md. 408; *Oberheim* v. *Reeside*, 116 Md. 275; *Schaidt* v. *Blaul*, 66 Md. 147; *Long* v. *Regan*, 94 Md. 464; *Herr* v. *Bierbower*, 3 Md. Ch. 458; *Davis* v. *Reed*, 14 Md. 157; *Shipley* v. *Ritter*, 7 Md. 413; *Shipley* v. *Caples*, 17 Md. 182; *Baugher* v. *Crane*, 27 Md. 42.

THOMAS, J., delivered the opinion of the court.

In 1917 the Easton Brick and Tile Manufacturing Company owned a brick yard, consisting of kilns and plant for the manufacture of brick and other clay products, and also certain clay deposits near Easton, Talbot County, Maryland. The capital stock of that company was owned, or was to be taken over, by the Clay Products Manufacturing Company, a corporation which was in possession of and operating the brick yard and plant under the supervision of Franklin A. White, the president of both of said companies, and who, it is alleged, owned the majority of the stock of the latter company. Desiring to make certain improvements in the plant with the view and for the purpose of doubling its capacity, the Clay Products Manufacturing Company and Franklin A. White, on the 27th of January, 1917, entered into the following contract with Harford P. Jenks, of Columbus, Ohio, who was engaged "in the business of designing, constructing and erecting dryers and brick kilns, and manufacturing and operating brick plants" under the name of the "Hook Patent Kiln Company of Columbus, Ohio":

"This agreement covering in full the understanding between the parties hereto, is made in duplicate this 27th day of January, 1917, between Hook Patent Kiln Company, of Columbus, Ohio, as the first party, and Clay Products Manufacturing Company, Baltimore, Maryland, as the second party, witnesseth:

"In consideration of the sum of one dollar and of the covenants hereinafter contained, the parties hereto do hereby mutually covenant and agree with each other as follows:

"First party is to erect one dryer and one kiln at Easton, Maryland, at location indicated by second party according to specifications attached hereto and terms of this agreement.

"First party may make such alterations in details as in the opinion of first party will give greater strength, more satisfactory service, better appearance, or if for any cause it is deemed better.

"All cash payments and notes become due if any payment remains more than ten days past due and unpaid, or the second party fails to furnish brick or otherwise hinders or prevents first party from proceeding with the work. Such payments by second party does not release first party from obligation to complete work within a reasonable time. The within payments and notes are guaranteed individually by second party and Frank A. White.

"Second party shall deliver brick within a convenient distance of the place they are to be used. From each cash payment made there shall be deducted for payment for brick three dollars and fifty cents per thousand for all brick used in construction, where such deduction has not already been made. Second party shall furnish brick at price specified above, and clay, ashes, lumber for scaffolding, motor boxes, &c., free, and allow the free use of barrows, shovels and other tools and material about the plant. It is understood that second party shall do all excavating, ready to start laying brick at time and as directed by first party.

No concrete foundations to be furnished or built by first party.

"The roof of the dryer shall be cut in sections to make it possible to take it down and move dryer to another location if second party so desires.

"The amount to be paid first party for dryer is fourteen thousand, eight hundred dollars, to be paid as follows:

"$1,466⅔ when dryer is one-fourth completed, and a $1,000 note due 6 months from date of agreement, bearing 6% interest.

"$1,466⅔ when dryer is one-third completed, and a $1,000 note due 6 months from date of agreement, bearing 6% interest.

"1,466⅔ when dryer is one-half completed, and a $1,000 note due 6 months from date of agreement, bearing 6% interest.

"The balance to be divided into three equal payments, one being due when dryer is two-thirds completed, another when three-fourths completed, and the balance when dryer is completed.

"The erection of one-half of dryer and stack for six-tunnel dryer, with whatever additional construction is necessary for the construction of the first half and stack, to be started not later than Feb. 5, 1917, and work pushed with all possible rapidity, the remaining part of this dryer to be built whenever in the judgment of 2nd party additional dryer capacity is needed.

"The kiln to be started one month from date of agreement, or as soon before as it is possible for both parties to get ready to do so.

"First party to have a man with second party without charge to second party after completion of first half of dryer, to show and explain how the dryer is to be operated, this assuming that second party is ready to operate dryer as soon as first half is completed.

"First party guarantees the first three tunnels of this dryer to have a capacity of 20,000 brick per day of 24 hours when brick are set on double-deck cars in num-

ber and as directed by first party and dryer is handled as directed by first party. Second party and its men to give all information and help possible to obtain this capacity. Brick delivered shall be free from visible moisture when a brick has been allowed to become cold and is broken.

"In the event the first three tunnels do not have this capacity it is agreed that first party shall build the additional tunnel or tunnels required to give this capacity. First party to pay second party same price as before for brick. Second party to furnish necessary amounts of the same kind of materials and do excavating as specified for first three tunnels.

"For each additional tunnel built first party shall be paid the sum of ($2,466⅔) two thousand, four hundred sixty-six and two-thirds dollars. From the total amount to be paid first party shall be deducted the fractional part required to make the capacity of dryer 20,000 brick per 24-hour day.

Kiln:

"The amount to be paid first party for one kiln built according to attached specifications is twenty-eight hundred and seventy-five dollars, to be paid as follows:

"⅓ when kiln is ¼ completed.

"⅓ when kiln is ½ completed, and the remaining third when kiln is completed.

"The said Frank A. White, who joins in the execution of this paper, has signed this agreement for the purpose of guaranteeing individually the performance of this contract by the Clay Products Manufacturing Company.

"In testimony whereof, the said H. P. Jenks, trading as the Hook Patent Kiln Company, has signed his name and affixed his seals, and the Clay Products Manufacturing Company, by Frank A. White, its President, has executed this contract and affixed its corporate seal, duly attested,

and the said Frank A. White has affixed
his hand and seal the day and year
first above written.

"H. P. Jenks,          (Seal)
"Trading as Hook Patent Kiln Com-
     pany of Columbus, Ohio.
     "Clay Products Manufactur-
          ing Company, by Frank-
          lin A. White, President.
     "Franklin A. White.  (Seal)
"Test as to all signatures:
     "F. A. Riley.
     "Wm. Lewis."

Within a few days after the execution of the contract the
Clay Products Manufacturing Company, hereinafter referred
to as the company, made the excavation therein referred to,
and on the 4th of February, 1917, Harford P. Jenks began
the construction of the dryer.  On or about the 5th of March
Mr. Jenks stated to Mr. White that the dryer was "one-fourth
completed" and requested payment of the first cash payment
of $1,466.66 and delivery of the company's note for $1,000
as provided in the contract.  The company was unable to
make the payment, but, relying upon Mr. Jenks' statement
of the extent of the work done, Mr. White delivered to him
the note of the company for $1,000, dated March 5th, 1917,
and payable on the 27th of July, 1917.  About the 2nd of
April Mr. Jenks reported to Mr. White that one-third of the
dryer (or two-thirds of the half that was to be erected at
once) had been completed and demanded payment of the sec-
ond cash payment and delivery of the second note provided
for in the contract.  The company was still unable to meet
the cash payments, but acting upon Mr. Jenks' report of the
amount of work completed, Mr. White delivered to him the
second note of the company for $1,000, dated April 2nd,
1917, and payable on the 27th of July following.  As the
company had failed to make either of the two cash payments
due under the contract, Mr. Jenks, as stated in his answer

and in his testimony, made an investigation of the condition
of the company and learned that he had been misled by mis-
representations of Mr. White, both as to the amount of the
company's property and its financial condition, and after con-
sulting his counsel, and "for the purpose of saving, if possi-
ble, what he had already spent" on the dryer, he decided, in
response to Mr. White's urgent appeals not to abandon the
erection of the dryer and kiln, to enter into the following
contract with the company:

> "This agreement, covering in full the understand-
> ing between the parties hereto, is made in duplicate this
> 3rd day of May, 1917, between Harford P. Jenks,
> trading as Hook Patent Kiln Company of Columbus,
> Ohio, as the first party, and Clay Products Manu-
> facturing Company, Baltimore, Maryland, as the sec-
> ond party, witnesseth:
>
> "In consideration of the sum of one dollar and of
> the covenants hereinafter contained, the parties hereto
> do hereby mutually covenant and agree with each
> other as follows:
>
> "First party shall take immediate possession of sec-
> ond party's brick plant and equipment at Easton,
> Maryland, and operate the same under the following
> conditions:
>
> "First party is to pay all expenses in connection
> with the operation of the business, except any repair
> bill that will amount to more than twenty dollars shall
> be paid by second party if first party so desires.
>
> "As a part of the operating expense shall be included
> one hundred twenty-five dollars per month, for gen-
> eral supervision and expenses of H. P. Jenks, it being
> understood that there shall not be added any traveling
> or personal incidental expenses to this amount and that
> Mr. Jenks is to devote only a part of his time to this
> work, and that first party may send another man to
> Easton under same terms and conditions instead of
> Mr. Jenks if first party so desires.
>
> "To the cost of operating business shall be added

two dollars per thousand brick manufactured as a profit for first party.

"The total cost of running business plus above designated profits shall be deducted from the net cash received from sale of product and the difference applied to the payment of indebtedness due first party by second party under contract with said Clay Products Manufacturing Company, the second party hereto, dated January 27th, 1917.

"First party shall have full possession and control of the business and collect all monies due or becoming due whilst operating said business hereunder until the indebtedness of second party to first party has been paid either by profits of plant to second party or by sale of capital stock.

"Whenever all cash payments specified on dryer and kiln have been paid first party shall turn over to second party the entire business, all accounts receivable, the plant and all manufactured stock on hand, providing further, that these payments have been made in full on or prior to July 27th, 1917, and providing, further, that the expense of operating plant and profit to first party has been paid. If cash payments, expenses and profits as specified have not been paid in full on or prior to July 27th, 1917, or if the amount and interest of notes specified to be given first party due July 27, 1917, are not paid on July 27, 1917, then this contract is automatically renewed and is in effect July 27th, 1917, and shall continue in effect until such time as all indebtedness of second party to first party is paid in full to that time, at which time first party shall give second party full possession of the business, plant, all accounts receivable for ware, stock on hand, etc. First party's profit on stock in racks or dryer shall be figured at one dollar per thousand and on stocks in kilns, stored on yard, at two dollars per thousand.

"When second party again takes possession of plant it shall promptly fill all unfilled orders taken by first

party as agreed by first party. It is agreed that first party may have 50,000 hard brick from first kiln at cost plus ($2.00) two dollars profit to first party, this total amount to be deducted from cash receipts from other ware, or paid in cash to first party.

"No part of this agreement shall be construed as in any way modifying, impairing or affecting the agreement of January 27th, 1917, or the terms of payment thereof, or as curtailing the right of first party to all means to collect whatever may be due him under the same.

"It is agreed that second party shall not further mortgage or in any way encumber its property or the property of the Easton Brick and Tile Manufacturing Company until all the terms of this contract and the contract of January 27th, 1917, have been complied with.

"Second party shall, without charge, promptly notify first party of all inquiries for brick and opportunities and prospects for sale of brick and render all possible assistance in sale of brick and furtherance of the business.

"In testimony whereof the said Harford P. Jenks, trading as Hook Patent Kiln Company, has signed his name and affixed his seal, and the Clay Products Manufacturing Company, by Franklin A. White, its President, has executed this contract and affixed its corporate seal, duly attested, the day and year first above written.

"H. P. Jenks,          (Seal)

"Trading as Hook Patent Kiln Company of Columbus, Ohio.

"Clay Products Manufacturing Company,      (Seal)

"By Frank A. White,
                              President.

"Test:

"J. Carson Riley.

"C. E. Trickle."

Upon the signing of the second agreement Mr. Jenks was given possession of the company's property and plant and entire control of its business, and from the date of said agreement to the 20th of December, 1919, when the company recovered possession and control under the injunction issued in this case, he operated the plant (employing Elwood Smith as superintendent), contracted for the sale and delivery of its products, received the proceeds and paid the costs and expenses of the business. After the execution of the contract of the 3rd of May, Mr. Jenks not only abandoned the prompt completion of the dryer and erection of the kiln, but also disposed of the material that had been delivered at the plant for that purpose, and removed from the dryer a part of the iron or steel work that had already been erected and, when urged by the company or by Mr. White to complete the dryer and kiln in order that the company might obtain the benefit of the desired increase in the capacity of the plant, he refused to do so until he had realized from the operation of the plant and business, over and above the costs and expenses, the entire contract price of the first half of the dryer and the price of the kiln, with interest thereon. Upon discovering that Mr. Jenks did not intend to resume work on the dryer until he had received the amount indicated, Mr. White, with the view of effecting a settlement with him and getting possession of the company's property, asked him on several occasions for a statement showing the result of his operation of the plant and business, but, according to Mr. White's testimony, he refused to give such a statement unless he was assured that the company was prepared to settle with him. Finally Mr. White received from him a letter, dated December 1st, 1919, containing the following statement of the business to November 15th, 1919, and of the amount claimed by him:

"Mr. Frank A. White,
        "Munsey Building,
                "Baltimore, Md.
    "Dear Sir:
        "As I was unpacking one of my suit cases here in the office today I recalled that you wanted a copy of

the recapitulation of the account. I give it below, this being complete to Nov. 15th. Adjustment can readily be figured from November 15th until date of settlement, 1919:

| | | |
|---|---|---|
| Nov. 1 to (brick sold and deliv. to Nov. 1, 1919), 1,886,-539 at $2 per M............ | $3,773.08 | |
| Nov. 1, by cash rec'd acct. (ledger) to red line abt. 11/1.... | | $20,145.52 |
| Nov. 15, to $125 per Mo. salary and expense, 2 yr. 6 m. 12 da. | 3,800.00 | |
| Jan. 1, 1918, to expense by Smith statement, labor, etc., '17...... ............... | 4,047.94 | |
| Jan. 1, 1919, to expense by Smith statement, labor, etc., '18.................... | 4,671.00 | |
| Nov. 15, 1919, to expense by Smith statement, labor, etc., '19. . ................... | 4,883.71 | |
| Nov. 15, 1919, to interest on acct. to 11/15/19.......... | 1,661.13 | |
| Mar. 5th, 1917, to dryer and kiln.................... | 10,275.00 | |
| Feb. 15, 1918, to expenses paid by Wm. Reddie........... | 716.35 | |
| Nov. 15, 1919, to expenses paid by H. P. Jenks............ | 3,305.18 | |
| Nov. 15, 1919, by receipts of H. P. Jenks, exclusive of led. | | 1,451.78 |
| Nov. 15, 1919, to 30,800 brk. from ledger report 11/1 to 11/15 at $2 per M......... | 61.60 | |
| Nov. 15, 1919, by cash recd. ledger report 11/1 to 11/15.... | | 3,143.02 |
| Nov. 15, 1919, to 83,300 brk. in shed at $1 per M........ | 83.30 | |
| Nov. 15, 1919, by 10,200 brk. in North kiln at $2........ | 204.00 | |

Nov. 15, 1919, to 64,000 brk.
   in South kiln at $2 . . . . . . . . .     128.00
Nov. 15, 1919, to 2,200 brk. in
   clinkers on yard at $2 . . . . . .     4.40
                                        _____

                       $37,614.69 $24,740.32."

From the above statement it appears that the total receipts of Mr. Jenks from the business amounted to $24,740.32, and that he claimed, in addition to the expenses of the business, including two dollars per thousand on all brick manufactured, a salary of $125 per month for the whole period of his possession of the plant, amounting to $3,800, the entire contract price of the first half of the dryer, and the contract price of the kiln, amounting to $10,275, and interest on the same to the amount of $1,661.13, and that the balance then due him was $12,874.37. It further appears from the evidence that, during his operation of the plant, Mr. Jenks exacted and received from the company, as further security for the price of the dryer and the kiln, certain bills of sale of its office furniture, machinery, etc. Mr. White testified that these bills of sale had been paid by the company, but had not been released by Mr. Jenks or returned to the company. As no reference is made to them in the statement submitted by Mr. Jenks, we may assume that the amounts thereof are included in one of the items of receipts.

After receiving the above statement, the Clay Products Manufacturing Company, the Easton Brick and Tile Manufacturing Company and Mr. White, on the 15th of December, 1919, filed their bill of complaint in the Circuit Court for Talbot County against Mr. Jenks and Elwood Smith, his superintendent of the plant, setting out the facts to which we have referred and praying (1) that the defendants, their agents, etc., be enjoined from interfering with the plaintiffs "in the possession" of their property and "in the management and operation" of their said plant and business. (2) That the defendants be required to account to the plaintiffs for all bricks manufactured during the time they had possession of

the plant; for all monies received and expended during that time, and for all "accounts, bills or other indebtedness due or owing for bricks sold" during that time. (3) That Mr. Jenks be required to return to the plaintiffs the bills of sale and promissory notes given him by the Clay Products Manufacturing Company, and that he be restrained from "collecting, negotiating, transferring or otherwise using" said notes. (4) That the said contracts of January 27th and May 3rd, 1917, be cancelled, and (5) for general relief. On the day the bill was filed the court below passed an order, in the usual form, granting an injunction as prayed, with leave to the defendants, upon the filing of their answers, to move for a dissolution of the injunction. On the 9th of February, 1920, Mr. Jenks filed his answer to the bill, alleging, in substance, that he had been induced to enter into the contract of January 27th, 1917, by the misrepresentations of the plaintiffs; that the plaintiffs had failed to comply with said contract, and that he had entered into the contract of May 3rd, 1917, "for the purpose of saving, if possible, a part of what he had already spent for materials and for the construction of said dryer"; that at the time he executed the contract of May 3rd there was due him under the contract of January 27th, $10,275, and that the "purpose of the contract of May 3rd, 1917," was "to put" him "in complete control of the said plant and products thereof" so that the proceeds could be applied to the payment of said sum and the interest thereon; that he had given the plaintiffs a complete statement of "his receipts and disbursements" up to November 15th, 1919, showing a balance due him of $12,884.37, and that he was willing at any time to surrender control of said plant upon the plaintiffs paying what was justly due him, amounting to "about $13,000."

It appears from the docket entries set out in the record that a motion to dissolve the injunction was filed February 11, 1920. After a hearing on the bill, answer and testimony taken before the court, the court below, on the 13th of September, 1920, passed a decree overruling the motion to dissolve and making the injunction perpetual, requiring the bills

of sale and promissory notes given by the company to Mr.
Jenks to be "cancelled and returned to the plaintiff," and can-
celling the contracts of January 27th and May 3rd, 1917.
That decree was subsequently rescinded by the court below
because of an error in the calculations on which it was based,
and on the 6th of November, 1920, the court passed an order,
reciting that it appeared from a further examination of the
testimony that there was due from the plaintiffs to the defend-
ant $3,689.66, and ordering "that the motion to dissolve the
preliminary injunction" be granted and the injunction dis-
solved "unless the plaintiffs pay the defendant the sum of
$3,689.66 on or before the 16th day of December, 1920." The
appeal in No. 20 appeals is by Mr. Jenks, the defendant,
from the order of November 6th, and the appeal in No. 21
appeals is by the plaintiffs from that order.

It is apparent from what has been said that the primary
question to be determined is the proper construction of the
contracts of January 27th and May 3rd, 1917. Mr. Jenks
contends that as the company failed to make the first two
cash payments when they became due under the contract of
January 27th, and as that contract declared that all payments
and notes should "become due" if any payment remained
"more than ten days past due and unpaid," and as the con-
tract of May 3rd provided that he should have possession and
control of the plant and business of the company until the
amount due him was paid, "either by profits of the plant
* * * or by sale of capital stock," he was entitled to retain
possession of the plant and business, and was not required to
erect a dryer and kiln, until he had received from the net
profits of the plant, or was otherwise paid, the full contract
price of the dryer and kiln, and interest thereon from the
date of the default of the company under the first contract.
No support for this contention can be found in the language
of the contracts, nor was there anything in the circumstances
under which they were executed to warrant such an unrea-
sonable construction. The only consideration moving to the
company under the contract of January 27th was the erection

·of the dryer and kiln, by which it expected the capacity of
the plant to be greatly increased. The defendant guaranteed
that "the first three tunnels" of the dryer would have "a
capacity of 20,000 bricks per day," and in order that the
·company might realize as soon as possible the anticipated
benefits from these improvements, the contract of January
27th expressly provided that the construction of the first half
·of the dryer should be started not later than February 5th,
1917, and the "work pushed with all possible rapidity," and
that the kiln should be started "one month from the date of
the agreement, or as soon before as it is possible for both par-
ties to get ready to do so." These important provisions of the
contract of January 27th were not in terms cancelled by the
·contract of May 3rd. On the contrary that contract declared,
"no part of this agreement shall be construed as in any way
modifying, impairing or affecting the agreement of January
27th, 1917." That the contract of May 3rd was intended to
secure the prompt erection of the dryer and kiln, as well as
the payment to the defendant of the amount due him, is fur-
ther shown by the clause providing for the return of the plant
to the company on July 27th, 1917, and for a renewal or a.
continuance of the contract beyond that date in case the de-
fendant was not fully compensated by that time.

Notwithstanding the contract of January 27th provided
that the kiln should be started within one month from that
date, the evidence shows that, when the defendant applied to
the company on March 5th, 1917, for the first payment on the
dryer, the kiln had not been started, and that nothing was
ever done by the defendant towards its erection. But even if
we assume that any suspension of the work on the dryer prior
to May 3rd was due to, and was justified by, the company's
failure to make the payments provided for in the contract of
January 27th, the only motive the company could have had
in entering into the contract of May 3rd was to secure the
immediate completion of the much desired improvements con-
tracted for by giving the defendant the additional security
afforded by that contract for the amount it had agreed to pay

for the same. The defendant had, as we have said, guaranteed the capacity of the dryer, and the company was anxious to secure the increased capacity of the plant that would result from the erection of the dryer and the kiln, but if, as the defendant contends, they were not, under the contract of May 3rd, to be completed until the entire contract price was paid, the company accomplished nothing by turning over its plant and business to the defendant, and the only result of the contract of May 3rd, so far as the company was concerned, was the imposition upon its business of the additional burden of the defendant's salary and his profit on all the bricks manufactured. That such a result was not contemplated by the parties, and that the company never intended to enter into such an agreement, is too obvious to require further discussion.

Learned counsel for the defendant insist that it would be unreasonable to assume that the defendant was willing to make any further outlay in the erection of the dryer or kiln after having discovered that the company was unable to meet the payments provided for in the contract of January 27th. If this suggestion is not answered by the fact that the contract of May 3rd provided that the defendant was to retain possession of the plant and business until he was paid the amount due him, we would add that it would be more unreasonable to assume that the company was willing to turn over its plant and business to him, and to impose upon it an additional burden, without any assurance that the improvements contracted for would ever be completed.

"The object to be attained in construing contracts is to ascertain the meaning and intent of the parties as expressed in the language used" (6 *R. C. L.*, sec. 225, p. 836; *Marshall* v. *Haney,* 4 Md. 498; *McEvoy* v. *Security Fire Ins. Co.,* 110 Md. 275), and viewing the contracts of January 27th and May 3rd in the light of the circumstances under which they were executed, considering the objects to be attained, and giving to the terms employed their ordinary meaning, we must hold that, upon the execution of the contract of May 3rd,

and upon obtaining possession of the company's plant and business, the defendant should have proceeded without unnecessary delay with the erection and completion of the dryer and kiln, and that his failure and refusal to do so was a clear violation of his obligation.

Counsel for the defendant also insist that the facts alleged in the bill do not bring the case within the jurisdiction of a court of equity; that for the recovery of its real or personal property the company had a complete and adequate remedy at law, and that no sufficient grounds were alleged for the cancellation of the contracts, bills of sale or promissory notes referred to. The defendant acquired possession of the company's plant and control of its business under the contracts in question for the purpose of erecting the dryer and kiln therein mentioned, and to secure the payment of the amount the company agreed to pay for the same. and, when he removed from the dryer the iron work that had already been erected, and refused to proceed further with the erection of the dryer and kiln, he forfeited his right to the possession and control of the plant and business. While the company could have recovered its real property in an action of ejectment, and could have resorted to an action of replevin for the recovery of its personal property, the injunctive relief asked for in the bill was not confined to the recovery of its property, but it also sought to enjoin the defendant from interfering with its management of the plant and its control of the business. That relief was within the power of a court of equity to grant (*Lord* v. *Smith,* 109 Md. 42) and could not have been obtained in a court of law, and where a court of equity assumes jurisdiction on any equitable ground, it will retain jurisdiction for the purpose of administering full and complete relief. 10 *R. C. L.,* sec. 120, p. 370; 14 *R. C. L.,* sec. 21, p. 322; *Green* v. *Drummond,* 31 Md. 71; *Md. Home Ins. Co.* v. *Kimmell,* 89 Md. 437; *Shipley* v. *Fink,* 102 Md. 229; *Aetna Indem. Co.* v. *Railway Co.,* 112 Md. 397. Mr. Pomeroy, in 1 *Pomeroy's Equity,* sec. 236 (2nd Ed.), says: "It may be stated as a general proposition, that wherever the

court of equity has jurisdiction to grant the remedy of injunction for some special purpose, even though the injunction covers only a portion of the controversy, it may go on and decide all the issues, and make a final decree granting full relief." It is said in 9 *Corpus Juris,* sec. 12, p. 1181, that "the general rule is well settled that the equitable relief of rescission will not be granted for a mere breach of contract," and that "in the absence of fraud, mistake, trust, cloud on title, multiplicity of suits, undue influence or some other independent ground of equitable jurisdiction, a court of equity will not cancel a contract on the sole ground that the defendant has failed to perform his part of the contract, but the plaintiff will be left to his action at law." But in the case of *DuBois Borough* v. *DuBois City Waterworks Co.,* 176 Pa. 437, 34 L. R. A. 92, the Supreme Court of Pennsylvania, after referring to the general rule, said: "And while we do not say that a wilfull and obstructive refusal to perform a contract, under circumstances which practically prevent the party aggrieved from entering into another, may not afford ground for equitable cancellation, yet some such special ground must appear in order to take the case out of the general rule that remedy for mere breach must be sought at law," and in the case of *Callahan* v. *Keeseville, A. C. & L. C. R. Co.,* 199 N. Y. 284, the Court of Appeals of New York said: "There is no hard and fast rule on the subject of rescission, for the right usually depends on the circumstances of the particular case. * * * It is not permitted for a slight, casual or technical breach, but, as a general rule only for such as are material and wilful, or, if not wilful, so substantial and fundamental as to strongly tend to defeat the object of the parties making the contract. * * * If the party who seeks rescission has an adequate remedy at law, ordinarily he is not entitled to rescind, but in case of repudiation, or of a breach going to the root of the contract, unless the damages can be ascertained with reasonable certainty, a rescission is a matter of right, with restitution instead of compensation." In the case at bar the jurisdiction of the court was not invoked for the

sole purpose of cancelling the contracts, bills of sale and promissory notes referred to, and we are not required to go further than to say that where a court of equity assumes jurisdiction on other grounds, and where, as in this case, the defendant has refused to perform an essential part of an entire and indivisible contract, the court, in order to administer full and complete relief, may cancel the contract.

In the order from which these appeals were taken the plaintiffs were required to pay the defendant $3,689.66. This sum, it appears, was arrived at by deducting the total receipts from the business during the time the defendant conducted the same from the amount of costs and expenses of the business, his salary of $125 per month and profit on the bricks manufactured during that time, and the sum expended by him in the partial erection of the dryer, prior to the contract of May 3rd, and was allowed on the theory that the plaintiffs, after discovering that the defendant did not intend to complete the dryer until he was paid or received the contract price of same, acquiesced in his refusal to do so and permitted him to continue in possession of the plant and control of the business until the institution of this suit.

The contracts of January 27th and May 3rd constitute one entire and indivisible contract in which the company agreed to pay the defendant for the erection of the dryer and kiln the sum therein stated and a salary of $125 per month during the time he operated the plant and conducted the business. *Dugan* v. *Anderson,* 36 Md. 567. Having refused, without any legal excuse for doing so, to perform the contract, the defendant was not in a position to recover, in either *general* or *special assumpsit,* any part of the compensation agreed upon, or for the work done in part performance of the contract. *Gill* v. *Vogler,* 52 Md. 663; *North Bros. & Straus* v. *Mallory,* 94 Md. 305. After the company turned over its plant and business to him it repeatedly urged him to complete the dryer and kiln so that it could get the benefit of the increased demand for brick, and when the company discovered that he did not intend to resume work on or to complete

the same until he received the entire contract price and interest thereon, it made several efforts to get a statement from him of what he had received and expended under the contract, with the view of reaching a settlement with him and recovering possession of its plant and control of its business. The record contains a letter from Mr. White to the defendant, dated December 23rd, 1918, asking him for an "itemized list" of his expenditures during the year 1918, stating that it was necessary to have a "clean up" with him on the dryer, and asking him how soon he could finish the dryer after the "necessary balance" was placed in his "hands," and the evidence is to the effect that the defendant refused to render a statement unless he was assured that the company was prepared to pay the entire amount he claimed to be due him. Under these circumstances the delay in bringing the suit does not amount to such acquiescence on the part of the company in the conduct of the defendant as deprives it of its right to recover control of its business or requires it to pay any part of the consideration of the contract which the defendant failed and refused to perform.

According to the statement rendered by the defendant in his letter of December 1st, the total receipts amounted to $24,740.32, the expenses paid by Smith, Reddie and the defendant amounted to about $17,624.18, and the defendant's profit on the bricks manufactured, provided for in the contract as a part of the "costs" of operating the plant, amounted to about $4,254.38. It therefore appears that after deducting from the total receipts all the costs and expenses (including profit on bricks) of the business, there was on the 15th of November, 1919, a balance to the credit of the business, and due the company, of about $2,861.76. The company did not get control of the business under the injunction granted until about a month later, and the evidence does not clearly show the exact amount received and paid out on account of the business during that time, but, in order to arrive at a correct account as of the date the company recovered control of the business, it is only necessary to add to the statement rendered

by the defendant such amounts as were received, and such costs and expenses as were paid by the defendant (including profit on bricks manufactured) between the 15th of November and the date the company recovered possession of the plant, and if the parties can agree as to these additional items there will be no necessity for a decree for an accounting. There is no evidence in the case of such negligence on the part of the defendant as would make him liable for the uncollected claim against Jewell referred to in the bill and the evidence.

It follows from what has been said that we entirely agree with the views expressed by the learned court below in the opinion filed with the decree of September 13th, 1920, except in regard to the allowance to the defendant of the salary of $125 a month and the amount expended by him in the partial erection of the dryer, and if the case had been submitted on the pleadings and evidence for final decree we would remand it for a decree in accordance with the views we have stated. But as the case was heard in the court below on a motion to dissolve the injunction previously granted, and was not submitted for final decree, we must reverse the order appealed from and remand the case in order that the court below may pass an order overruling the motion to dissolve and continuing the injunction until final hearing. *Hoffman Coal Co.* v. *Cumb. C. & I. Co.,* 16 Md. 511; *Cumb. C. & I. Co.* v. *Sherman,* 20 Md. 130, 131.

> *In Nos. 20 and 21 Appeals order reversed and cause remanded in order that an order may be passed in accordance with the foregoing opinion, the costs in this court and in the court below to be paid by Harford P. Jenks, the appellee in No. 21 Appeals.*